

**Dated: September 15, 2016.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**

_____

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| ABIE WOLF | § | Case No. 15-31477-HCM |
| Debtor. | § | (Chapter 7) |
| RANDOLPH N. OSHEROW, | § | |
| as Chapter 7 Trustee | § | |
| Plaintiff, | § | Adversary No. 16-03002-HCM |
| v. | § | |
| REMA CHARLES a/k/a | § | |
| REMA CHARLES WOLF | § | |
| Defendant. | § | |
| JUDY A. ROBBINS, | § | |
| as United States Trustee | § | |
| Plaintiff, | § | Adversary No. 16-03005-HCM |
| v. | § | |
| ABIE WOLF | § | |
| Defendant. | § | |

**CONSOLIDATED OPINION REGARDING**
**(A) COMPLAINT TO RECOVER FRAUDULENT TRANSFERS**
**AND (B) COMPLAINT OBJECTING TO DISCHARGE OF DEBTOR**

Start with an unfortunate, unsophisticated—yet untruthful—debtor. Add the transfer of the debtor's properties to his wife, while facing a large judgment. Divide by a rushed uncontested divorce. Multiply by a bankruptcy filing where there is an attempted cover-up. The net result: the properties are recoverable as fraudulent transfers and the debtor's discharge is denied.

1

# TABLE OF CONTENTS

**I. INTRODUCTION**................................................................................................**3**

    A. Consolidated Trial................................................................................. 3

    B. Jurisdiction ........................................................................................... 3

**II. PROCEDURAL BACKGROUND**......................................................................**5**

    A. Debtor's Filing of Chapter 7 Bankruptcy ............................................. 5

    B. Fraudulent Transfer Adversary Proceeding......................................... 5

    C. Discharge Adversary Proceeding ........................................................ 6

    D. Consolidation of Adversary Proceedings for Trial …………………………..7

**III. FINDINGS OF FACT**......................................................................................**8**

    A. Witnesses and Exhibits ....................................................................... 8

    B. Real Properties Descriptions and Conveyances................................... 9

    C. Abie and Rema Personal History ...................................................... 15

    D. Chronology of Pre-Bankruptcy Events .............................................. 18

    E. Current Bankruptcy Filing by Abie-2015 ............................................ 34

    F. Consideration and Value for Transfers .............................................. 40

**IV. CONCLUSIONS OF LAW**

**FRAUDULENT TRANSFER ADVERSARY PROCEEDING**............................**44**

    A. Date of Transfer................................................................................. 45

    B. Actual Fraudulent Transfer ................................................................ 48

    C. Constructive Fraudulent Transfer ...................................................... 57

    D. Date a Claim Arises........................................................................... 62

    E. Section 548(c) Defense ..................................................................... 65

    F. Section 550 Recovery from Rema and Related Defenses.................. 70

    G. Impact of Divorce Decree.................................................................. 77

    H. Impact of Property Tax Suits ............................................................. 85

    I. Unclean Hands Defense ..................................................................... 87

    J. Conclusion ......................................................................................... 89

**V. CONCLUSIONS OF LAW**

**DISCHARGE ADVERSARY PROCEEDING** .................................................**90**

    A. Standard and Burden of Proof .......................................................... 90

    B. False Oath or Account—§ 727(a)(4)................................................. 91

    C. Collateral Estoppel .......................................................................... 101

    D. Conclusion ...................................................................................... 104

**VI. CONCLUSION**............................................................................................**104**

# I.
## INTRODUCTION

### A. Consolidated Trial

On August 9 and August 11, 2016, the Court conducted a consolidated trial in: (A) adversary proceeding no. 16-03002 ("Fraudulent Transfer Adversary Proceeding"); and (B) adversary proceeding no. 16-03005 ("Discharge Adversary Proceeding") (collectively "Adversary Proceedings").

The Fraudulent Transfer Adversary Proceeding was filed by Randolph N. Osherow, as Chapter 7 trustee and Plaintiff ("Trustee") against Rema Charles a/k/a Rema Charles Wolf, as Defendant ("Rema"). The Discharge Adversary Proceeding was filed by Judy A. Robbins, as United States Trustee and Plaintiff ("UST") against Abie Wolf, as debtor and Defendant ("Abie").

The Court previously consolidated the Fraudulent Transfer Adversary Proceeding and the Discharge Adversary Proceeding for the purposes of trial under Rule 7042(a)(1) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), due to common questions of fact, law, witnesses and exhibits. *See* Orders (dkt# 19, adv. no. 16-03002; dkt# 15, adv. no. 16-03005). For the same reasons, the Court issues this Consolidated Opinion, which will be entered in each adversary proceeding. A separate final judgment will be entered in each adversary proceeding, consistent with Rule 58 of the Federal Rules of Civil Procedure, which is incorporated into Bankruptcy Rule 7058.

### B. Jurisdiction

This Court has jurisdiction over the Adversary Proceedings pursuant to 28 U.S.C. §§ 157 and 1334. The Adversary Proceedings arise in and under a bankruptcy case referred to this Court by the Standing Order of Reference entered in this District.

Specifically, the Fraudulent Transfer Adversary Proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(H). This Court has authority to enter final orders and a final judgment in the Fraudulent Transfer Adversary Proceeding, as the parties have expressly consented to entry of final orders and a final judgment by this Court. *See* Order and Statements (dkt# 5, 7, 14, adv. no. 16-03002).  The Discharge Adversary Proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(J). This Court has authority to enter final orders and a final judgment in the Discharge Adversary Proceeding. *See also* Order and Statements (dkt# 5, 9, 10, adv. no. 16-03005).

This Consolidated Opinion constitutes the Court's findings of fact and conclusions of law with respect to the Fraudulent Transfer Adversary Proceeding and the Discharge Adversary Proceeding, in accordance with Bankruptcy Rules 7052(a)(1) and 9014(c).[1] In reaching the findings and conclusions set forth in this Consolidated Opinion, the Court has considered and weighed all the evidence, the demeanor and credibility of witnesses, the admitted exhibits, the arguments of counsel, and the pleadings and briefs filed by all parties, regardless of whether they are specifically referenced in this Consolidated Opinion.[2]

---

[1] To the extent any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.

[2] Cents (pennies) are intentionally omitted by the Court in the dollar figures used in this Opinion. Sense, however, is not intentionally omitted.

4

**II.**
**PROCEDURAL BACKGROUND**

**A. <u>Debtor's Filing of Chapter 7 Bankruptcy</u>**

On September 22, 2015, Abie Wolf (herein "Abie"), as a debtor, filed a voluntary petition under Chapter 7 of the Bankruptcy Code with this Court in bankruptcy case no. 15-31477. On September 22, 2015, Randolph N. Osherow was appointed as Chapter 7 trustee in Abie's bankruptcy case (herein "Trustee").

**B. <u>Fraudulent Transfer Adversary Proceeding</u>**

On January 26, 2016, the Trustee, as Plaintiff, filed a Complaint to Recover Fraudulent Transfers ("Trustee's Complaint") in adversary proceeding no. 16-03002 ("Fraudulent Transfer Adversary Proceeding"). The Trustee's Complaint was filed against Rema Charles a/k/a Rema Charles Wolf, as Defendant (herein "Rema").

In general, through the Trustee's Complaint, the Trustee seeks to avoid and recover the transfers of nine real properties made by Abie to Rema (Abie's former spouse). Eight of the real properties were conveyed directly from Abie to Rema, and one of the real properties was conveyed indirectly from Abie to Rema (through their son Phil Wolfe). The Trustee's Complaint seeks recovery of such transfers under §§ 548(a)(1)(A), 548(a)(1)(B) and 550 of the Bankruptcy Code, and under Tex. Bus. & Comm. Code § 24.001, *et. seq.*, also known as the Texas Uniform Fraudulent Transfer Act ("TUFTA"). *See* Trustee's Complaint (dkt# 1, adv. no. 16-03002).

On February 23, 2016, Rema filed an Answer to the Trustee's Complaint. The Answer contains a general denial of the allegations in the Trustee's Complaint. Through the Answer, Rema contends that she received the real properties from Abie pursuant to agreements made between Abie and Rema's father, that there was consideration for

5

the transfers, and that the real property deeds were signed two to three years prior to the bankruptcy filing. The Answer also contends that one of the real properties was transferred by Abie to Phil Wolfe (a non-party), and that the Court lacks jurisdiction over that property. *See* Answer (dkt# 10, adv. no. 16-03002).[3]

On July 6, 2016, the Trustee and Rema filed a Joint Pre-Trial Order in the Fraudulent Transfer Adversary Proceeding ("Joint PTO") (dkt# 18, adv. no. 16-03002). The Joint PTO contains various stipulations of fact by the parties in the Fraudulent Transfer Adversary Proceeding. The Joint PTO and the stipulations contained therein have been accepted by the Court.

### C. Discharge Adversary Proceeding

On February 5, 2016, the United States Trustee (herein "UST"), as Plaintiff, filed a Complaint Objecting to Discharge of Abie Wolf ("UST's Complaint") in adversary proceeding no. 16-03005 ( "Discharge Adversary Proceeding"). The UST's Complaint was filed against Abie Wolf, as Defendant and debtor in this bankruptcy case (herein "Abie").

In general, through the UST's Complaint, the UST seeks to deny a bankruptcy discharge to Abie for transferring and concealing properties (the real properties transferred from Abie to Rema, as well as other property), filing false bankruptcy schedules, and providing false testimony (including false testimony regarding Rema and the transfers of property to Rema). The UST's Complaint seeks denial of discharge

---

[3] On July 28, 2016, Rema filed an Amended Answer to the Trustee's Complaint. *See* Amended Answer (dkt# 21, adv. no. 16-03002). The Amended Answer is untimely and was filed without leave of Court well after the deadline for amending pleadings of April 11, 2016 set by the Court in its Scheduling Order. The Amended Answer was filed after the Joint PTO was submitted by the parties, after docket call for trial, after the trial was set, and just two weeks prior to trial. *See* Scheduling Order, Joint PTO, Order Setting Trial (dkt# 8, 18, 19, adv. no. 16-03002). As a result, it is not necessary for the Court to consider any new issues raised in the Amended Answer filed by Rema not included in the original Answer and Joint PTO.

6

under §§ 727(a)(2)(A), 727(a)(2)(B), and/or 727(a)(4)(A) of the Bankruptcy Code. *See* UST's Complaint (dkt# 1, adv. no. 16-03005).

On February 23, 2016, Abie filed an Answer to the UST's Complaint. In general, through the Answer, Abie admits and denies certain allegations contained in the UST's Complaint. In addition, Abie sets forth an affirmative defense of collateral estoppel regarding ownership of certain of the real properties transferred from Abie to Rema, based on the alleged preclusive effect of state court property tax suits and a state court divorce decree. *See* Answer (dkt# 4, adv. no. 16-03005).

On June 16, 2016, the UST and Abie filed a Joint Pre-Trial Order in the Discharge Adversary Proceeding ("Joint PTO") (dkt# 12, adv. no. 16-03005). The Joint PTO contains various stipulations of fact by the parties in the Discharge Adversary Proceeding. The Joint PTO and the stipulations contained therein have been accepted by the Court. After trial, Abie filed a post-trial memorandum of authorities with the Court. (dkt# 21, adv. no. 16-03005).

## D. Consolidation of Adversary Proceedings for Trial

On July 14, 2016, the Court conducted a docket call for trial in the Fraudulent Transfer Adversary Proceeding and in the Discharge Adversary Proceeding. Counsel for all parties were present at this docket call. After discussion with counsel, and due to common questions of fact, law, witnesses, and exhibits, the Court consolidated the Fraudulent Transfer Adversary Proceeding and the Discharge Adversary Proceeding (herein collectively "Adversary Proceedings") for the purposes of trial under Bankruptcy Rule 7042(a)(1). *See* Order Setting Consolidated Trial (dkt# 19, adv. no. 16-03002; dkt# 15, adv. no. 16-03005).

**III.**

**FINDINGS OF FACT**

The following constitutes findings of fact by the Court in the Fraudulent Transfer Adversary Proceeding and Discharge Adversary Proceeding (herein collectively "Adversary Proceedings").

**A. Witnesses and Exhibits**

The consolidated trial in the Adversary Proceedings was conducted on August 9 and 11, 2016. Five witnesses testified in person at the trial in the Adversary Proceedings: (1) Mr. Randolph Osherow, as Chapter 7 bankruptcy trustee in this bankruptcy case and Plaintiff in the Fraudulent Transfer Adversary Proceeding (herein "Trustee"); (2) Mr. Abie Wolf, the debtor in this bankruptcy case and Defendant in the Discharge Adversary Proceeding (herein "Abie"); (3) Mr. Elvis Wolf, a son of Abie and Rema ("Elvis"); (4) Mr. Larry Chambers, a friend of Abie ("Chambers"); and (5) Ms. Rema Charles a/k/a Rema Charles Wolf, the ex-spouse of Abie and Defendant in the Fraudulent Transfer Adversary Proceeding (herein "Rema").[4]

The Court admitted certain exhibits into evidence at the trial. The exhibits of the UST admitted into evidence were G-1 through G-32 (herein "Ex. G-_"). The exhibits of Abie admitted into evidence were A-1 through A-5 (herein "Ex. A-_"). The exhibits of the Trustee admitted into evidence were TR-1 through TR-25 (herein "Ex. TR-_"). The exhibits of Rema admitted into evidence were R-1 through R-30 (herein "Ex. R-_").[5]

---

[4] The Court has considered and weighed all testimony of all witnesses, regardless of whether the testimony of a witness is specifically referenced in this Consolidated Opinion.

[5] Duplicate copies of many exhibits were admitted at trial. For the most part, at trial the parties used copies of the exhibits submitted by the UST (Ex. G-_), so the Court will do the same.

B. <u>Real Properties Descriptions and Conveyances</u>

At trial, the parties stipulated as to the use of common names for the different real properties at issue in the Adversary Proceedings. *See* List of Real Properties (Ex. G-24; dkt# 29, adv. no. 16-03002; dkt# 22, adv. no. 16-03005). The Court will use these common names in this Consolidated Opinion when referring to the different real properties at issue.

Following are the common names, legal descriptions, and a summary of information provided at trial regarding record ownership and conveyances of the different real properties.

(1) "Montana 1" means the real property located at the NE ¼ of Section 34, Block 79, Township 2, Texas and Pacific Railroad Survey, also known as Tract 11B, El Paso County, Texas, and being more particularly described by the metes and bounds description in Exhibit A attached to the Warranty Deed recorded in the real property records of the Clerk of El Paso County, Texas on March 6, 2014 (document no. 20140014039), property ID no. 335102. *See* Exs. G-12, G-24.

In general, Montana 1 is real property with some improvements and consists of approximately 1.701 acres with a street address of 12947 Montana Ave., Socorro, Texas. In 1987, Abie purchased Montana 1 (in Abie's former name) together with another individual, and financed the purchase. In 1998, the other individual and co-owner of Montana 1 conveyed his interest to Abie. Abie then conveyed Montana 1 to Rema by a Warranty Deed dated January 13, 2012, which was recorded in the El Paso County Clerk's real property records on March 6, 2014 (document no. 20140014039). *See* Exs. G-12, G-24 (aerial view).

9

(2) "Montana 2" means the real property located at the NE ¼ of Section 34, Block 79, Township 2, Texas and Pacific Railroad Survey, also known as Tract 11B-8, El Paso County, Texas, and being more particularly described by the metes and bounds description in Exhibit A attached to the Warranty Deed recorded in the real property records of the Clerk of El Paso County, Texas on March 6, 2014 (document no. 20140014040), property ID no. 267438. *See* Exs. G-13, G-24.

In general, Montana 2 is real property contiguous to Montana 1, and consists of approximately 1.664 acres with a street address of 12937 Montana Ave., Socorro, Texas. In 2001, Abie purchased Montana 2 (in Abie's former name) from his sister. Abie conveyed Montana 2 to Rema by a Warranty Deed dated September 27, 2011, which was recorded in the El Paso County Clerk's real property records on March 6, 2014 (document no. 20140014040). *See* Exs. G-13, G-24 (aerial view).

(3) "Montana 3" means the real property located at Section 34, Block 79, Township 2, Texas and Pacific Railroad Survey, also known as Tract 11B-9, El Paso County, Texas, and being more particularly described by the metes and bounds description in the Warranty Deed recorded in the real property records of the Clerk of El Paso County, Texas on March 11, 2014 (document no. 20140015322), property ID no. 200793. *See* Exs. G-14, G-24.

In general, Montana 3 is real property contiguous to Montana 2 and consists of approximately 1.63 acres located on Montana Ave., Socorro, Texas. In 2005, Abie purchased Montana 3 and financed the purchase with First Savings Bank. Abie conveyed Montana 3 to Rema by a Warranty Deed dated March 20, 2011, which was

recorded in the El Paso County Clerk's real property records on March 11, 2014 (document no. 20140015322). *See* Exs. G-14, G-24 (aerial view).

(4) "Montana 4" means the real property located at Section 27, Block 79, Township 2, Texas and Pacific Railroad Survey, El Paso County, Texas, and being more particularly described by the metes and bounds description in Exhibit A attached to the Warranty Deed recorded in the real property records of the Clerk of El Paso County, Texas on June 5, 2008 (document no. 20080045745), property ID no. 349408. *See* Exs. G-15, G-24.

In general, Montana 4 is unimproved real property and consists of approximately 0.8586 acres. In 2008, Abie purchased Montana 4. Based on the exhibits and evidence at the trial, Abie is still the record owner of Montana 4. *See* Exs. G-15, G-24 (aerial view).

(5) "Montana 5" means the real property located at Section 6, Block 78, Township 2, Texas and Pacific Railroad Survey, also known as Tract G, El Paso County, Texas, and being more particularly described by the metes and bounds description in Exhibit A attached to the Warranty Deed recorded in the real property records of the Clerk of El Paso County, Texas on March 6, 2014 (document no. 20140014041), property ID no. 85156. *See* Exs. G-16, G-24.

In general, Montana 5 is unimproved real property and consists of approximately 7.19 acres located on Montana Ave., in Clint, Texas. In 1999, Abie purchased Montana 5 (in Abie's former name) together with another person, and financed the purchase. In 2000, the other owner of Montana 5 conveyed his interest to Abie. Abie conveyed Montana 5 to Rema by a Warranty Deed dated March 20, 2011, which was recorded in

the El Paso County Clerk's real property records on March 6, 2014 (document no. 20140014041). *See* Exs. G-16, G-24 (aerial view).

(6) "Montana 6" means the real property located at Section 4, Block 78, Township 2, Texas and Pacific Railroad Survey, also known as Tract 2, El Paso County, Texas, and being more particularly described by the metes and bounds description in Exhibit A attached to the Warranty Deed recorded in the real property records of the Clerk of El Paso County, Texas on June 3, 2015 (document no. 20150037259), property ID no. 370906. *See* Exs. G-17, G-24.

In general, Montana 6 is unimproved real property and consists of approximately 59.2586 acres located on Montana Ave., in Clint, Texas. In 2006, Abie purchased a 1/4th interest in Montana 6 with three other individuals, and financed the purchase. In March 2013, one of the individuals and co-owners conveyed his interest in Montana 6 to Abie and the remaining co-owners, and Abie then became the owner of a 1/3rd interest in Montana 6. Abie conveyed his 1/3rd interest in Montana 6 to Phil Wolfe (Abie's son) by a Special Warranty Deed dated November 3, 2011, which was recorded in the real property records of the Clerk of El Paso County, Texas on July 14, 2014 (document no. 20140044591). Phil Wolfe then conveyed the 1/3rd interest in Montana 6 to Rema, his mother, by a Special Warranty Deed dated August 11, 2014, which was recorded in the real property records of the Clerk of El Paso County, Texas on June 3, 2015 (document no. 20150037259). *See* Exs. G-17, G-24 (aerial view).

(7) "Jim Bridger 1" means the real property located at Lot 7, Block 9, Unit 1, Homestead Meadows, El Paso County, Texas, property ID no. 201438. *See* Exs. G-18, G-24.

In general, Jim Bridger 1 is real property and consists of approximately 5.06 acres with a street address of 14425 Jim Bridger Rd., Clint, Texas. In 2006, Abie purchased Jim Bridger 1. Abie conveyed Jim Bridger 1 to Rema by a Warranty Deed dated September 27, 2011, which was recorded in the real property records of the Clerk of El Paso County, Texas on March 11, 2014 (document no. 20140015319). *See* Exs. G-18, G-24 (aerial view).

(8) "Jim Bridger 2" means the real property located at Lot 8, Block 9, Homestead Meadows, El Paso County, Texas, property ID no. 277006. *See* Exs. G-19, G-24.

In general, Jim Bridger 2 is unimproved real property and consists of approximately 5.06 acres with a street address of 14449 Jim Bridger Rd., Clint, Texas. In 2007, Abie purchased Jim Bridger 2. Abie conveyed Jim Bridger 2 to Rema by a Warranty Deed dated March 25, 2011, which was recorded in the real property records of the Clerk of El Paso County, Texas on March 11, 2014 (document no. 20140015320). *See* Exs. G-19, G-24 (aerial view).

(9) "Horizon City" means the real property located at Lot 9, Block 17, Horizon City Estates Unit 25, El Paso County, Texas, property ID no. 152839. *See* Exs. G-20, G-24.

In general, the Horizon City property is unimproved real property and consists of approximately 11,610 square feet. In 2009, Abie purchased the Horizon City property. Abie conveyed the Horizon City property to Rema by a Warranty Deed dated January 13, 2012, which was recorded in the real property records of the Clerk of El Paso County, Texas on March 11, 2014 (document no. 20140015321). *See* Exs. G-20, G-24 (aerial view).

(10) "Southside" means the real property located at Tract 27A2, Block 52, Ysleta Grant, El Paso County, Texas, property ID no. 186058. *See* Exs. G-21, G-24.

In general, Southside is unimproved real property and consists of approximately 1.07 acres, with a street address of 1181 Southside, El Paso, Texas. In 1999, Abie purchased Southside (in his former name) and financed the purchase. Abie conveyed Southside to Rema by a Warranty Deed dated June 14, 2009, which was recorded in the real property records of the Clerk of El Paso County, Texas on February 24, 2014 (document no. 20140011170). *See* Exs. G-21, G-24 (aerial view).

(11) "Galveston" means the real property located at Tracts 4 and 4A, Block 75, San Leon Farm Home Tracts, Galveston County, Texas, property ID no. R153342. *See* Exs. G-22, G-24.

In general, the Galveston property consists of approximately 10 acres in Galveston County, Texas. In 1997, Abie purchased Galveston (in his former name). Abie conveyed Galveston to Rema by a Warranty Deed dated March 10, 2008, which was recorded in the real property records of the Clerk of Galveston County, Texas on January 3, 2014 (document no. 201400289). Apparently, however, in February 2015, Galveston was sold at a sheriff's sale to a third party for non-payment of taxes, and litigation is pending regarding such sale. *See* Exs. G-22, G-24 (aerial view).

(12) "Luna County" means the real property located at the E/2 of Section 22, T25S, R9W of the N.M.P.M., in Luna County, New Mexico. *See* Exs. G-23, G-24.

In general, Luna County is unimproved real property located in the State of New Mexico and consists of approximately 31.45 acres. In 2010, Abie executed a real estate contract as buyer of the Luna County property. Based on the exhibits admitted at trial,

Abie is still the record owner of the Luna County property. *See* Exs. G-23, G-24 (aerial view). Further, in the Discharge Adversary Proceeding, Abie and the UST stipulated that Abie is still the record owner of the Luna County property, and that such property is not listed on Abie's bankruptcy schedules in this bankruptcy case. *See* Joint PTO, ¶¶ 28-30 (dkt# 12, adv. no. 16-03005).

(13) "Hudspeth" means the real property located at Unit 45, Lots 10, 11, and 12, Section 47, Block 76, Texas and Pacific Railroad Survey, Hudspeth County, Texas, property ID nos. 60149, 60150, and 60151. *See* Exs. G-32, G-24.

Hudspeth is unimproved real property and consists of approximately 60.06 acres, known as Sunset Ranches. In 2008, Abie purchased Hudspeth and financed the purchase through a vendor's lien. By Warranty Deed dated October 13, 2012 and recorded on November 2, 2012, Abie obtained title to Hudspeth free of the vendor's lien. *See* Ex. G-32. At trial, Elvis (Abie's son) testified that Abie sold the Hudspeth property to Elvis, but the unrecorded deed alleging such transfer from Abie to Elvis (Ex. A-6) was not admitted into evidence due to lack of authenticity.

C. **Abie and Rema Personal History**

Abie was born in Saudi Arabia and moved to the United States when he was a child. Abie then moved to El Paso, Texas when he was a young man. Abie spent much of his adult life as a mechanic and towing operator in the El Paso region. Abie has little formal education and is not sophisticated.

Abie's former legal name was "Abduel Elshmah Almaghrabi". Abie also used the names "Abdulahah M.A.H. Almaghrbi", "Abdul ELH Amaghrabi", "Abdul M. Al Maghrabi", "Abdulelah Almaghrabi", "Abdul Ah Habeeb Al Magarabi", and "Abdul

Almaghrabi". In March 2002, Abie officially changed his legal name to "Abie Charles Wolf", and has also used the names "Abraham Wolf", and "Abie C. Wolf". Abie currently uses the name "Abie Wolf". (Exs. G-1; G-12; G-13, G-16; G-21; G-22; G-23; G-26).

Rema was born in Kuwait and is of Greek heritage. Rema testified that she moved to the United States sometime in the 1980s, apparently after she met Abie. Rema testified that she has sown clothes to earn money since moving to the United States.

Rema's former legal name was "Rema Ayoun Abual". In May 2003, Rema legally changed her name to "Rema Charles Wolf". (Ex. G-26). At trial, Rema testified that her name was "Rema Charles" and she had no idea why "Wolf" was in her name. However, Rema's current photo identification card still uses the name "Rema Charles Wolf". Apparently, Rema has never legally changed her name from "Rema Charles Wolf" to "Rema Charles". (Ex. G-25). At trial, Rema also testified that her name is "Irene Charles", but no documents were provided showing that Rema used that name.

According to Abie, he met Rema in Kuwait. Both Abie and Rema testified that they were married in the 1980s. However, court documents filed by Rema state that they were married in March 1991. (Ex. G-25).

Abie and Rema have four children—two sons and two daughters. According to court documents, the four children are Phil Wolf a/k/a Phil Wolfe ("Phil"), who was born in November 1990; Elvis Wolf ("Elvis"), who was born in April 1994; Sarah Wolf ("Sarah"), who was born in January 2000; and Suzan Wolf ("Suzan"), who was born in February 2001. (Ex. G-26).

Rema testified that she and Abie separated in the year 2009. But court documents filed by Rema state that they ceased living together as man and wife in February, 2012. (Ex. G-25).

Abie and Rema were legally divorced in September 2014. (Ex. G-25). According to Rema, she and Abie had been married for about 24 or 25 years.

At trial, Abie testified that he suffered a stroke about three years ago while in jail, and that, as a result, he sometimes gets confused. Presently, Abie is impoverished and relies on assistance of his friends and children. Abie's current income consists mainly of government assistance and he lives in a motor home. Although the Court is sympathetic to Abie's present situation, his testimony at trial was often inconsistent with written documents and many prior statements made by Abie under oath. Abie's testimony was often unsupported by documentary evidence. The Court heard several different versions of the same events from Abie. Abie has shown he is unwilling to tell the truth. As a result, Abie's testimony at trial has limited credibility with the Court.

At trial, Rema was an excitable, emotional and angry witness. Rema was, understandably, upset by this lawsuit and the stress of caring for a daughter that Rema testified has special needs. However, Rema's testimony at trial was also often inconsistent with written documents and prior statements made by Rema under oath. Rema's testimony was often unsupported by any documentary evidence whatsoever. Rema's testimony at trial was often evasive and rambling, vague and general, and sometimes incomprehensible. Although the Court is very sensitive to Rema's plight and cultural challenges, Rema's testimony at trial has very limited credibility with the Court.

### D. **Chronology of Pre-Bankruptcy Events**

Following is a chronology of key events leading up to Abie's current bankruptcy filing in September 2015.

Purchase of Real Properties by Abie

Starting in 1987, Abie began purchasing real properties in El Paso, Texas and the surrounding region. Over the next 23 years, Abie acquired about 13 different real properties. Detailed descriptions of the real properties acquired by Abie are set forth above. In sum, Abie purchased Montana 1 in 1987; Galveston in 1997; Montana 5 in 1999; Southside in 1999; Montana 2 in 2001; Montana 3 in 2005; Montana 6 in 2006; Jim Bridger 1 in 2006; Jim Bridger 2 in 2007; Montana 4 in 2008; Hudspeth in 2008; Horizon City in 2009; and Luna County in 2010. (Exs. G-12 through G-23, G-32).

All of these real properties were purchased solely in Abie's name—none of the real properties were purchased in Rema's name and none were purchased in the joint names of Abie and Rema. The acquisition of several of the real properties was financed by the sellers, with Abie (not Rema) as the borrower.   During this acquisition period, Abie was a mechanic and operated a business known as Mac H Auto General Mechanic and Repair located in El Paso.

Execution of Deeds of Real Properties to Rema

A series of warranty deeds from Abie to Rema (and one to Phil) of the real properties were executed by Abie. There is no dispute that Abie signed these deeds. What was disputed is whether the execution dates in the deeds from Abie are accurate, and when the deeds were actually delivered to Rema.

18

The execution dates on the deeds range from 2009 to early 2012. Detailed descriptions of the deeds of the real properties to Rema are set forth above. Specifically, the deeds from Abie to Rema are dated as follows: the deed for Southside is dated June 14, 2009; the deed for Montana 3 is dated March 20, 2011; the deed for Montana 5 is dated March 20, 2011; the deed for Jim Bridger 2 is dated March 25, 2011; the deed for Montana 2 is dated September 27, 2011; the deed for Jim Bridger 1 is dated September 27, 2011; the deed for Montana 1 is dated January 13, 2012; and the deed for Horizon City is dated January 13, 2012. In addition, the deed of Montana 6 from Abie to Phil (his son) is dated November 3, 2011, with a subsequent deed from Phil to Rema dated August 11, 2014. (Exs. G-12 through G-21). These deeds from Abie to Rema (and Phil) were not recorded, however, until several years later—in 2014.

At trial, questions were raised by the Trustee and UST regarding the execution dates of these deeds from Abie. In general, the Trustee and UST suggested that the deeds were back-dated to make it appear that Abie had executed the deeds and conveyed the real properties to Rema and Phil years before the Starr suit and judgment against Abie. This contention by the UST and Trustee has some support.

For example, the stated execution date of the Montana 6 deed from Abie to his son Phil is questionable (Montana 6 was then conveyed by Phil to Rema). The Special Warranty Deed from Abie to Phil has an execution date of November 3, 2011, and states that Abie is conveying his "1/3rd" interest in Montana 6 to Phil. However, on November 3, 2011, Abie did not own a 1/3rd interest in Montana 6. As of November 3, 2011, Abie only owned a 1/4th interest in Montana 6. It was not until March 2013 that Abie acquired an additional interest in Montana 6 that increased Abie's ownership

interest from a 1/4th to a 1/3rd interest. Notably, this deed of Montana 6 from Abie to Phil was not recorded until July 14, 2014. (Ex. G-17).  At trial, Abie was confronted with this inconsistency regarding the amount of his ownership interest in Montana 6 on the stated execution date of his deed to Phil, but Abie had no adequate or coherent explanation. As a result, it is questionable that the deed from Abie of Montana 6 was actually executed by Abie on the stated execution date of November 3, 2011.

Likewise, the execution date of the Hudspeth deed from Abie to Elvis (his other son) is questionable. (Ex. G-32). The deed from Abie to Elvis has an execution date of October 5, 2011, and the legal description attached to this deed is a photocopy of a surveyor's description with page "1" printed at the bottom. (Ex A-6).[6] This surveyor's description however, clearly came and was photocopied from a warranty deed from the seller (Sunset Ranches) to Abie dated October 12, 2012 and recorded on November 2, 2012—well after the supposed October 5, 2011 execution date of the deed from Abie to Elvis. (Ex. G-32). This conclusion is confirmed by the initial warranty deed with vendor's lien from the seller to Abie dated December 8, 2008, that has a surveyor's description attached with "Exhibit A, B, C" printed at the bottom (not page "1"). (Ex. G-32). The execution date of the deed from Abie to Elvis is also very dubious, as in October 2011 (the stated date of execution), Elvis was only a 17-year old boy who supposedly paid $5300 in cash to his father Abie for the property at the time.

Other surrounding circumstances provide indications that the deeds from Abie to Rema may have not been actually executed by Abie and were not actually delivered to Rema on their stated execution dates—which range from 2009 through early 2012.

---

[6] Due to the lack of authenticity of this deed from Abie to Elvis (which was not recorded), Ex. A-6 was not admitted into evidence. The UST examined Abie regarding this deed on voir dire, and the Court sustained the UST's objection as to its authenticity.

First, of course, is the undisputed fact that the deeds from Abie to Rema were not recorded until 2014—years after their stated execution date and on the eve of trial of the Starr suit against Abie. Second, in July 2013, Abie filed a prior bankruptcy case during which Abie stated, under penalty of perjury and in sworn testimony, that Abie was the owner of the real properties in July 2013. (Exs. G-8, G-29). Third, in July 2012, Abie filed pleadings in state court suits protesting tax valuations of five of the real properties in dispute. In these pleadings, Abie stated that he was the owner of those real properties at that time. (Exs. A-2 to A-5).

The notary public (Ms. Jean Marie Mowad) who apparently notarized the execution of several of the deeds by Abie did not testify at trial, and Ms. Mowad was not listed as a witness. Weeks after conclusion of the trial, Rema filed a Motion to Re-Open Evidence in the Fraudulent Transfer Adversary Proceeding (together with an Affidavit), which requested the Court to now permit Ms. Mowad to be deposed or interviewed. *See* Motion (dkt# 31, adv. no. 16-03002). By separate Order, the Court has denied the Motion to Re-Open Evidence for several reasons. First and foremost, as a legal matter, the execution dates of the deeds by Abie is not critical—as the date of recording of the deeds is when a "transfer" of real property occurs under fraudulent transfer laws.[7]

Regardless of the execution dates of these deeds from Abie to Rema, the testimony at trial regarding the physical delivery of the deeds to Rema and the actual dates of delivery to Rema was inconsistent and not credible. At trial, Elvis testified that he picked up most of the executed deeds for the real properties from his father, Abie, and then delivered the deeds to his mother, Rema. Elvis did not, however, testify as to when (i.e., the dates) he actually picked up and delivered these executed deeds.

---

[7] *See* below Conclusions of Law by the Court.

21

Further, in her deposition, Rema testified that her son, Phil, gave her the executed deeds from Abie. But at trial, Rema testified that her son, Elvis, gave her the deeds. Abie testified in deposition that he gave some of the deeds to Elvis and some to Phil to deliver to Rema. And no one clearly testified as to the dates upon which the deeds were actually delivered to Rema.

So, there is some question as to whether the execution dates in the deeds from Abie to Rema are accurate. But even assuming that the execution dates in the deeds are accurate, the Court finds that no probative evidence demonstrated the dates of actual delivery of the deeds to Rema. In any event, the execution dates of the deeds by Abie is not critical from a legal perspective—as the dates that the deeds were publicly recorded is when a "transfer" of real property occurs under fraudulent transfer laws.[8]

Starr Suit-2012

In May 2012, Abie's world began to crumble when Garry Starr and Bonnie Starr ("Starrs") hired Abie to tow their broken down motor home from Van Horn to El Paso. Abie towed the motor home, and a dispute immediately erupted between the Starrs and Abie. In short, Abie refused to return the motor home to the Starrs, claiming that the Starrs owed various storage and repair fees. (Ex. G-29).

Allegedly, Mr. Starr caused emotional trauma to Abie and Rema's minor daughter in a June 2012 incident relating to pick up of the motor home. No findings are made by this Court regarding this alleged incident involving the Starrs and the minor daughter, which is apparently the subject of pending litigation in another court.[9]  For the purposes of this trial, the Court finds only that both Abie and Rema blame the Starrs for

---

[8] *See* below Conclusions of Law by the Court.

[9] *See* Joint PTO (dkt# 18, adv no. 16-03002).

this alleged incident with their daughter, and that both Abie and Rema were at the time (and remain today) genuinely distressed over their daughter's condition.

On August 7, 2012, the Starrs filed suit against Abie in the 243rd District Court of El Paso County, Texas, cause no. 2012-DCV-05225 ("Starr Suit").[10] In short, the Starrs sought damages from Abie in addition to the return of their motor home. Abie had taken the Starrs' motor home and retitled it in Abie's name (Exs. G-28; G-29). Ultimately, the state court rendered a large final judgment against Abie in the Starr Suit, as discussed below (Ex. G-28).

Rema admitted she became aware of the Starr Suit filed against Abie in the year 2012. This was soon after the Starr Suit was filed, and before the recordation of any of the deeds from Abie to Rema of the real properties.

Abie's Prior Bankruptcy Cases-2013

A series of hearings to enforce Abie's compliance with state court orders regarding the Starrs' motor home, caused Abie to file bankruptcy twice in this Court in the year 2013 to prevent the Starr Suit from proceeding. (Ex. G-29).

On May 20, 2013, Abie filed a Chapter 13 bankruptcy petition with this Court, case no. 13-30827. (Ex. G-6). Soon thereafter, this bankruptcy case was dismissed, due to the failure of Abie to timely file bankruptcy schedules. (Ex. G-7).

Then on July 29, 2013, Abie filed another Chapter 13 bankruptcy petition with this Court, case no. 13-31228 ("2013 Bankruptcy Case"). (Ex. G-8). In this case, Abie filed sworn Bankruptcy Schedules and a Statement of Financial Affairs (collectively "2013 Bankruptcy Schedules") with this Court. (Ex. G-8). Abie personally signed these

---

[10] The Starrs also sued Mr. Larry Chambers in this state court lawsuit. Mr. Chambers testified at trial in these Adversary Proceedings as Abie's friend.

2013 Bankruptcy Schedules, under penalty of perjury, and declared that he had read the schedules and that the information contained therein was true and correct.

These sworn 2013 Bankruptcy Schedules required Abie to list all of the assets (including real property) that Abie owned as of July 29, 2013—the date of filing of his 2013 Bankruptcy Case. On Schedule A of the 2013 Bankruptcy Schedules, Abie stated, under penalty of perjury, that Abie owned nine pieces of real property with an aggregate value of $504,455. (Ex. G-8). Specifically, Abie stated in these 2013 Bankruptcy Schedules that he owned the following real properties—Montana 1, Montana 5, Horizon City, Southside, Montana 3, Jim Bridger 1, Montana 2, Jim Bridger 2, and Montana 6. Nowhere in these 2013 Bankruptcy Schedules did Abie disclose or even mention that Rema (or Phil) owned or claimed any type of interest in these real properties.[11]

On August 15, 2013, this Court held a hearing in the 2013 Bankruptcy Case. Abie testified at such hearing under oath. (Ex. G-29). Abie testified that he had filed a list of all of his assets with the Court. Abie repeatedly testified that his 2013 Bankruptcy Schedules showed that he owned lots of real properties with a value of about $500,000. Abie also testified that he had paid the property taxes of about $10,000 on such real properties on January 31, 2013. When Abie was examined about where he got the money to pay the property taxes, Abie responded "I used to work". At no time during this 2013 testimony did Abie disclose, or even mention, Rema, or that Rema somehow actually owned the real properties or paid the taxes on the real properties. (Ex. G-29).

At the conclusion of this 2013 hearing, this Court refused to extend the bankruptcy automatic stay as to the Starr Suit, which was pending in state court at that

---

[11] Instead, on Schedule A, which Abie swore was accurate, Abie stated he owned almost all the real properties in "fee simple". (Ex. G-8).

time. In short, this Court found that the 2013 Bankruptcy Case was not filed by Abie in good faith with respect to the Starrs, and that this bankruptcy filing by Abie was "blatant forum shopping" because Abie was unhappy with the state court's rulings requiring turnover of the motor home to the Starrs. (Ex. G-29).

On September 4, 2013, Abie filed a motion to voluntarily dismiss his 2013 Bankruptcy Case. (Ex. G- 9). The Chapter 13 trustee filed a response to Abie's motion, requesting dismissal of Abie's bankruptcy case with prejudice due to Abie's concealment of assets, including personal property and vehicles. (Ex. G-21). Ultimately, the Court entered an Agreed Order between the Chapter 13 trustee and Abie, whereby Abie's 2013 Bankruptcy Case was dismissed with prejudice, and Abie was barred from filing bankruptcy for a period of two years—until after September 20, 2015. (Ex. G-11).

The 2013 Bankruptcy Case of Abie is significant now in these Adversary Proceedings for several reasons. First, in 2013 Abie repeatedly stated, under penalty of perjury and in sworn testimony, that Abie owned the real properties. There was no mention by Abie of Rema back in 2013, or that Rema (or Phil) somehow owned the real properties in 2013.[12] Now at trial in these Adversary Proceedings, Abie testified that Rema had always really owned these real properties and that Abie had signed deeds transferring these real properties to Rema way back in the years 2009 through 2012. Second, Abie testified in 2013 that he paid the property taxes on the real properties, and indicated he used funds from his work to pay the taxes. Now at trial in these Adversary Proceedings, Abie and Rema take the position that Rema paid the property taxes.

---

[12] In fact, Abie concealed Rema's very existence in his 2013 Bankruptcy Case. Abie stated in his 2013 Bankruptcy Schedules that he was "single" and that he had no spouse. (Ex. G-8). This is untrue, as Abie was still married to Rema in the year 2013. (Ex. G-25). This concealment by Abie of Rema's existence continued in this recent 2015 bankruptcy case, as discussed below.

Third, Abie learned first-hand in the 2013 the importance of disclosing all of his personal property (including vehicles) in his bankruptcy schedules. Now, in the Discharge Adversary Proceeding, the UST has alleged that Abie has failed to disclose all of his personal property (including vehicles) in Abie's present bankruptcy case.

Finally, Abie's 2013 Bankruptcy Case was dismissed with prejudice and Abie was barred from filing bankruptcy for the next two years. Abie had few remaining options to prevent collection of any judgment the Starrs might be awarded in the pending Starr Suit—other than to transfer these real properties to Rema during this two-year period. This would effectively place the properties out of reach of the Starrs; and this is exactly what happened.

Recording of Deeds to Rema-2014

In the year 2014, the Starr Suit against Abie was still pending and set for trial in April 2014 in state court. Abie had been barred from filing bankruptcy during the year 2014.

Over a two-week period starting in late February 2014 through early March 2014, Rema recorded the deeds from Abie to Rema for the real properties in the El Paso County Clerk's office. Specifically, the deed from Abie to Rema of Southside was recorded on February 24, 2014; the deed from Abie to Rema of Montana 1 was recorded on March 6, 2014; the deed from Abie to Rema of Montana 2 was recorded on March 6, 2014; the deed from Abie to Rema of Montana 5 was recorded on March 6, 2014; the deed from Abie to Rema of Montana 3 was recorded on March 11, 2014; the deed from Abie to Rema of Jim Bridger 1 was recorded on March 11, 2014; the deed from Abie to Rema of Jim Bridger 2 was recorded on March 11, 2014; and the deed

from Abie to Rema of Horizon City was recorded on March 11, 2014. (Exs. G-12 through G-21). So, notably, these deeds from Abie to Rema were recorded just two months prior to the start of the trial in the Starr Suit against Abie.

At trial, Rema testified that an unnamed "friend" told Rema that she needed to record the deeds and that it was this friend's urgings that led Rema to record the deeds for the real properties. But Rema was unable to provide the name or identity of this "friend". Rema testified that she did not know the name of this "friend". The Court finds this testimony by Rema—that a friend told Rema to record the deeds but that Rema did not know the name or identity of the friend—hard to believe under the circumstances. By early 2014 when Rema recorded the deeds, Rema knew of the Starr Suit against Abie. Rema knew, or at least should have strongly suspected, that the Starr Suit would not end well for Abie, given that Abie had already been sanctioned and jailed by the state court. The deeds from Abie were recorded by Rema in 2014, on the eve of trial in the Starr Suit. And, in early 2014, Rema was still extremely upset with the Starrs, and blamed the Starrs for the alleged incident that harmed their daughter.

No direct connection was shown at trial between Abie and Rema leading to the suspicious recording of these deeds in 2014. But given the surrounding circumstances, a reasonable inference is drawn by the Court that Abie was at least indirectly involved in the recording of the deeds in early 2014. A looming trial against Abie in the Starr Suit was set to begin in just a couple of months. Abie had already been sanctioned and jailed by the state court for violations of court orders, and should have (justifiably) been concerned that he was facing a substantial adverse judgment. Abie and Rema were both extremely upset with the Starrs—blaming them alleged injury to their minor child.

In early 2014, Abie and Rema were still married, but not living together. Regardless, the evidence demonstrated that Abie and Rema were still in communication with each other at this time through their children. At trial, Rema and Abie's testimony about their living locations and arrangements, and travel to see their children during this 2014 period, was evasive and inconsistent. Abie stated in sworn filings with this Court that he lived at an "unknown" address in Houston, Texas in the year 2014 (Ex. G-2), which is a location close to where Rema testified she lived in 2014.

All of this, when coupled with Rema's testimony that an unnamed "friend" told her to record the deeds in 2014, makes it highly probable that Abie was at least indirectly involved with the recording of the deeds by Rema in early 2014.

Prior to trial, Rema and the Trustee stipulated that Abie was "insolvent" at the time the deeds to Rema were recorded, for the purposes of the Fraudulent Transfer Adversary Proceeding.  *See* Joint PTO (dkt# 18, adv no. 16-03002). Upon the transfer of these real properties by Abie to Rema in early 2014, Abie became financially destitute, had few remaining assets, had little income, and had no way to make a living. In short, Abie effectively became "judgment proof".

Starr Trial and Judgment against Abie-2014

On April 25, 2014, the state court conducted a jury trial in the Starr Suit, which lasted several days. Abie and his attorney appeared and Abie testified at the trial. On April 30, 2014, the jury rendered a unanimous verdict against Abie. In short, the jury found that Abie had committed actual fraud against the Starrs, that Abie had acted with malice, and that Abie had converted the Starrs' motor home. (Ex. G-28).

On May 12, 2014, the state court entered a final judgment against Abie in favor

of the Starrs ("Starr Judgment"). The Starr Judgment awarded over $400,000 in damages against Abie (including $100,000 in exemplary damages), cancelled the title to the Starrs' motor home that Abie had issued in his own name, and denied Abie's counterclaims against the Starrs.[13]  (Ex. G-28).

Abie's anticipated fears became stark reality. A substantial adverse judgment was rendered against Abie in the Starr Suit.  The Starr Judgment was entered just two months after the deeds of the real properties from Abie to Rema were recorded. And on July 14, 2014, shortly after the judgment against Abie, the deed of Montana 6 from Abie to Phil (his son) was recorded. Phil then turned around and conveyed Montana 6 to Rema by warranty deed dated a month later (August 11, 2014), which was recorded on June 3, 2015. (Ex. G-17).

Divorce Proceeding and Decree-2014

Within two weeks after the Starr Judgment was rendered against Abie, Rema filed a divorce proceeding against Abie. Rema filed a Petition for Divorce on May 23, 2014 in Fort Bend County, Texas, cause no. 14-DCV-214910 ("Divorce Proceeding").[14] (Ex. G-25). Less than a month later (on June 19, 2014), Abie waived notice of the Divorce Proceeding, agreed that the Divorce Proceeding could be taken up by the court without further notice to Abie, and waived the making of a record in the Divorce Proceeding. (Ex. G-25).

---

[13] At trial, Abie testified that he has appealed the Starr Judgment. The Starrs have filed a Proof of Claim in Abie's bankruptcy case based on the Starr Judgment. (claim dkt# 1-1, bankruptcy case no. 15-31477). The Starr Judgment is a final judgment against Abie. Unless and until the Starr Judgment is reversed on appeal by a state appellate court, this Court must give full faith and credit to the Starr Judgment. *See, e.g., Fid. Standard Life Ins. Co. v. First Nat'l Bank & Trust*, 510 F.2d 272, 273 (5th Cir. 1975); *In re Dronebarger*, No. 10-10889, 2011 WL 350479, at *5 (Bankr. W.D. Tex. Jan. 31, 2011).

[14] At trial, Rema generally testified that she had hired an attorney to file a divorce proceeding for an unspecified "long time", and did not know when the proceeding would actually be filed by the attorney.

On September 12, 2014, a Final Decree of Divorce dated September 8, 2014 was entered in the Divorce Proceeding ("Divorce Decree"). On its face, the Divorce Decree states that Rema and her counsel appeared at a hearing on September 8, 2014, Abie did not appear at the hearing, and the making of a record was waived by both Rema and Abie. (Ex. G-25).

Of some importance now, the Divorce Decree awarded some real properties to Rema. *See* Divorce Decree, ¶¶ W-5 through W-9 (Ex. G-25). But a legitimate question exists regarding exactly which real properties were awarded to Rema in the Divorce Decree.[15] At trial, counsel for Rema offered his interpretation of which real properties were awarded to Rema in the Divorce Decree, and (understandably) conceded that several legal descriptions in the Divorce Decree were poorly drafted and inaccurate.

Many of the legal descriptions of real properties in the Divorce Decree are tortured—containing partial and run-on legal descriptions with significant typographical errors that are impossible to accurately comprehend. *See e.g.,* Divorce Decree, ¶¶ W-6, W-9 (Ex. G-25). It is apparent that the real property descriptions in the Divorce Decree were created in a rush, with little or no review. The Court has now had the opportunity to study the legal descriptions in the Divorce Decree closely and compare them to the legal descriptions in the deeds executed by Abie to Rema. The Court concludes that the following three real properties were clearly awarded to Rema in the Divorce Decree— Southside (¶ W-5); Montana 6  (¶ W-7); and Montana 5 (¶ W-8). It is perhaps possible

---

[15] Counsel for Rema and the Trustee stipulated that Rema was awarded the "majority of the properties" in the Divorce Decree, for the purposes of trial in the Fraudulent Transfer Adversary Proceeding. *See* Joint PTO ¶ III(F) (dkt# 18, adv no. 16-03002). It is unclear to the Court whether this stipulation related to the real properties previously transferred by Abie to Rema or all properties in general that were divided and awarded to Rema and Abie in the divorce. And if the stipulation was intended to mean a majority of the real properties, the stipulation does not say which real properties were awarded to Rema in the Divorce Decree—which is problematic given the tortured legal descriptions contained in the Divorce Decree.

that Montana 3 was awarded to Rema in paragraph W-6 of the Divorce Decree, and that Montana 1, Montana 2, Jim Bridger 2, and Horizon City were perhaps awarded to Rema in paragraph W-9 of the Divorce Decree—but the Court cannot reach any conclusion about these five real properties. The legal descriptions in paragraph W-9 of the Divorce Decree are garbled jibberish, and the legal description in paragraph W-6 is inaccurate at best.

The Divorce Decree also includes a finding by the state court that the decree is a "just and right division of the parties' marital estate, having due regard for the rights of each party and the children of the marriage". *See* Divorce Decree, p. 27 (Ex. G-25). At trial, the Trustee established that the Divorce Decree did not equally divide the property between Abie and Rema—Abie got little to no cash and some vehicles (that Abie said he did not own), and Rema was awarded a significant number of real properties. Nothing contained in the Divorce Decree reflects that the rights of creditors of Abie (a party) was taken into account in dividing the marital estate—such as the over $400,000 judgment against Abie rendered in the Starr Suit just a few months before the decree. It is likely a safe assumption that the state court judge that signed the Divorce Decree was not even aware of the recent judgment against Abie at the time.

There are several irregular and peculiar circumstances surrounding the Divorce Proceeding and entry of the Divorce Decree in the year 2014. First, Abie effectively "sandbagged" in the Divorce Proceeding—Abie did not appear at the Divorce Proceeding and voluntarily waived notice and participation in the proceeding on June 19, 2014 (about one month after the Starr Judgment was rendered against Abie). In substance, Abie let Rema take whatever assets Rema wanted in the divorce.

This also appears to be a "rush" divorce pushed by Rema. The divorce petition was filed by Rema against Abie immediately after the Starr Judgment was entered. The Divorce Decree was submitted for entry by the court on August 20, 2014 (soon after the statutorily required waiting period). The divorce was so rushed that the Divorce Decree (signed by Rema but not Abie) contains inaccurate and garbled legal descriptions. The Divorce Decree and the docket in the Divorce Proceeding state that the Divorce Decree was an "Agreed Judgment", yet only Rema signed the Divorce Decree.

The Divorce Decree purported to award (at least some) real properties of Abie to Rema in September 2014, yet Abie had previously conveyed these real properties to Rema by deeds recorded in February and March 2014. And then there is the even stranger situation about the award of Montana 6 to Rema through the Divorce Decree in September 2014—Abie had previously conveyed Montana 6 to Phil (his son) by deed recorded on July 14, 2014. There are also additional minor irregularities in the Divorce Decree—such as listing Abie's name as "Able"—and other significant irregularities—such as the inaccurate and incomprehensible descriptions of real properties.[16]

The Divorce Decree also awarded Abie ownership of several large motor vehicles ("Vehicles"). *See* Divorce Decree, ¶¶ H-6 through H-16 (Ex. G-25). At trial, Abie testified that these Vehicles were really owned by third party customers, and that he had provided a list of the Vehicles to Rema.

Property Tax Suits-2014

In September 2014, the state courts in El Paso County dismissed several property tax suits that were filed by Abie regarding some of the real properties

---

[16]    There was no evidence that the Divorce Decree—which purported to award Rema ownership of certain real properties—was filed in the deed records of any county.

("Property Tax Suits") (Exs. A-1 through Ex. A-5).  Back in September 2011 and July

2012, Abie filed the Property Tax Suits in state court relating to five of the real

properties—Montana 5 (Ex. A-1), Montana 3 (Ex. A-2), Jim Bridger 2 (Ex. A-3),

Montana 2 (Ex. A-4), and Montana 1 (Ex. A-5). Basically, Abie filed these suits to

protest the property tax valuations of these real properties made by the El Paso Central

Appraisal District ("CAD"). In his petitions, Abie stated that he was the owner of these

real properties and that he had standing to protest the tax valuations.

     The Property Tax Suits lingered for several years after their filing. Then, in May

2014, the CAD filed motions to dismiss all five of the suits, asserting that the properties

had been transferred from Abie to Rema. The CAD based these motions to dismiss on

the recently recorded warranty deeds from Abie to Rema in March 2014. So, in

September 2014, the state courts entered orders dismissing the Property Tax Suits filed

by Abie, finding that Abie was not the owner of these properties and had no standing.

     Now, in these Adversary Proceedings, Abie and Rema contend that the dismissal

of the Property Tax Suits by the state courts has preclusive effect on this Court and

conclusively establish that Rema (and not Abie) owned these real properties back in

2011. This is not correct.

     It is easy for the Court to understand what happened in these Property Tax Suits

from just examining the pleadings and orders in such suits. Abie was the record owner

of these five real properties in 2011 and 2012 when Abie filed the suits, as no deeds to

Rema had been recorded. It was not until March 2014 that the deeds to these real

properties from Abie to Rema were actually recorded with El Paso County—giving

notice to CAD and everyone else of the deeds and Rema's ownership. (Exs. G-12, G-

13, G-14, G-16, G-19). After the deeds to Rema were recorded in March 2014, CAD promptly sought dismissal of the suits in May 2014. And since these recorded deeds to Rema were dated back to 2011, CAD took the position that Abie did not have standing as the owner to file Property Tax Suits in the first place. The state courts then agreed with CAD, and dismissed Abie's suits in September 2014.

There is no mystery here, it is simple to see what transpired and why. The dismissal of these Property Tax Suits does not have the preclusive effect of establishing that Rema owned the real properties back in 2011. The recording of the deeds from Abie to Rema in March 2014 is what caused these suits to be dismissed by the state courts.

Finally, Abie and CAD were the parties to the Property Tax Suits. The Trustee was not a party to these suits and neither was Rema or the UST.

**E. <u>Current Bankruptcy Filing by Abie-2015</u>**

The two year bar precluding Abie from filing bankruptcy again expired on September 20, 2015. (Ex. G-11). So, two days later—on September 22, 2015—Abie filed a voluntary petition under Chapter 7 in this Court, which is the current bankruptcy case no. 15-31477 ("Bankruptcy Case"). (Ex. G-1).

<u>Abie Bankruptcy Schedules</u>

On September 22, 2015, Abie filed his sworn bankruptcy schedules ("Bankruptcy Schedules") and sworn Statement of Financial Affairs ("SOFA") in this Bankruptcy Case. (Ex. G-1). Abie personally signed the Bankruptcy Schedules and SOFA under penalty of perjury, and declared that the information contained therein was true and correct.

The sworn Bankruptcy Schedules filed by Abie required Abie to list all assets (including real property and personal property) that Abie owned or had an interest in on September 22, 2015—the date this Bankruptcy Case was filed. Abie understood the critical importance of listing all of his assets in his Bankruptcy Schedules in this Bankruptcy Case, as Abie's 2013 Bankruptcy Case was dismissed with prejudice for two years, based on the contention that Abie had failed to list all assets (including vehicles) in that prior bankruptcy case.

Schedule A of his Bankruptcy Schedules required Abie to list all legal and equitable interests that Abie owned in real property on September 22, 2015. Abie answered, under penalty of perjury, "none". (Schedule A, Ex. G-1). This was a false statement by Abie, as the evidence at trial demonstrated that Abie still owns interests in the Montana 4 property, the Luna County property, and the Hudspeth property.

The evidence demonstrated that Abie acquired the Montana 4 property in June 2008. (Ex. G-15). No probative evidence to the contrary was presented at trial. No probative evidence demonstrated that Abie had sold or transferred the Montana 4 property before filing this Bankruptcy Case. Instead, the evidence at trial showed that Abie is still the record owner of the Montana 4 property.

Further, the evidence at trial demonstrated that Abie acquired an interest in the Luna County property in March 2010. (Ex. G-24). At trial, Abie testified that he had not paid for the Luna County property, and therefore never took ownership of Luna County.

35

Even if Abie's trial testimony was true, Abie is still the record owner of the Luna County property, based on the evidence and stipulations presented at trial.[17]

The evidence also demonstrated that Abie acquired the Hudspeth property in 2008, by warranty deeds recorded in December 2008 and November 2012. (Ex. G-32). Although Abie's son Elvis testified that Abie had transferred the Hudspeth property to Elvis by deed dated November 2011, the deed was not admitted into evidence at trial due to its lack of authenticity. (Ex. A-6). Further, the supposed deed from Abie to Elvis was not recorded, so Abie is still the record owner of Hudspeth in any event.

Schedule B of his Bankruptcy Schedules required Abie to list all personal property that Abie owned, including trucks, trailers, vehicles, and machinery, on September 22, 2015—the date this Bankruptcy Case was filed. Abie answered, under penalty of perjury, "none" other than a 1982 Mercedes. (Schedule B, Ex. G-1). The evidence at trial demonstrated that Abie was awarded ownership of the Vehicles in the Divorce Decree entered in September 2014. *See* Divorce Decree, ¶¶ H-6 through H-16 (Ex. G-25). At trial, Abie testified that he had provided the list of Vehicles to go into the Divorce Decree, so Abie obviously knew of the Vehicles. At trial, Abie also testified that the Vehicles were really owned by his third party customers. Even if this trial testimony by Abie is true, then Abie was required to disclose the Vehicles in SOFA Question 14 as property held for another person. Instead, Abie answered "none" to this Question in his SOFA. (SOFA, Ex. G-1). Either way, Abie's lack of disclosure of the Vehicles constitutes a false statement.

---

[17] For the purposes of trial in the Discharge Adversary Proceeding, Abie stipulated that he was still the record owner of the Luna County property (also called the "New Mexico" property) and that he did not list the property in his Bankruptcy Schedules. *See* Joint PTO, ¶¶ 28-30 (dkt# 12, adv. no. 16-03005).

SOFA Question 15 required Abie to disclose all places that Abie had lived in the last three years if he had moved in that period. Abie answered, under penalty of perjury, "none". (SOFA, Ex. G-1). This was a false statement by Abie. At trial, Abie admitted that he had moved and lived other places within the prior three years. Compounding this deception, in his bankruptcy petition Abie stated that his street address was 14424 Jim Bridger, El Paso, Texas 79938. (Petition, Ex. G-1). Yet at trial, Abie admitted that this Jim Bridger address is merely a post office box and not a residence. And subsequently Abie filed sworn statements with the Court stating that he really lived on Marvin Lane in El Paso, Texas when he filed this bankruptcy.

Abie later filed an amended SOFA to list three locations where he had lived in the prior three years. (Ex. G-2). Yet at trial, at a creditor's meeting, and in his deposition, Abie testified about prior addresses that were again inconsistent with even his amended SOFA.  Abie's prior locations in the last three years is of heightened importance in this particular bankruptcy case, given the multiple transfers of real property by Abie to Rema and other critical events that occurred in this three-year period, as set forth above in the chronology of pre-bankruptcy events.

SOFA Question 16 required Abie to disclose the name of his former spouse. Abie answered, under penalty of perjury, that "Ayoun Marian" was the name of his former spouse. (SOFA, Ex. G-1).  But Rema was Abie's former spouse. Rema's name—for the past 12 years—was "Rema Charles Wolf". There was no evidence that Rema ever went

by the name "Ayoun Marian".[18]  The Court must find that this was a false statement by Abie, and an intentional deception by Abie to conceal Rema's existence.[19]

Finally, SOFA Question 10 required Abie to disclose all transfers of property made within the two years prior to his bankruptcy filing in September 2015, that were out of the ordinary course of business. Abie again answered, under penalty of perjury, "none". (SOFA, Ex. G-1).  Abie did not disclose the transfers of multiple real properties to Rema by deeds recorded in 2014.

Testimony by Abie at Creditors Meeting

On December 8, 2015, Abie testified at a meeting of creditors in this Bankruptcy Case. (Ex. G-30). This meeting is statutorily required under the Bankruptcy Code, and the debtor must appear and testify under oath. Creditors are invited to attend the meeting of creditors, and the trustee appointed in the debtor's case presides at the meeting and examines the debtor.

In Abie's Bankruptcy Case, the appointed Trustee was Randolph Osherow (herein "Trustee"). Prior to this creditors meeting, the Trustee had learned about the 2013 Bankruptcy Case filed by Abie and the multiple real properties that Abie stated he owned in the prior case. In the sworn 2013 Bankruptcy Schedules filed by Abie in his 2013 Bankruptcy Case, Abie had stated that he owned nine pieces of real property worth over $500,000. (Ex. G-8). But now in this Bankruptcy Case filed in 2015, Abie had filed sworn Bankruptcy Schedules stating that he owned no real property and that he

---

[18] At one point—over a decade ago—Rema's legal name was "Rema Ayoun Abual". In May 2003, Rema legally changed her name to "Rema Charles Wolf". (Ex. G-26).

[19] On February 26, 2016, Abie filed an Amended SOFA that disclosed that his former spouse was really named "Rema Charles". (Ex. G-20). Notably, this later "come clean" filing by Abie was after the UST had filed the Discharge Adversary Proceeding against Abie based on false statements about Rema, after the Trustee had filed the Fraudulent Transfer Adversary Proceeding against Rema, and after Abie had been cornered by the Trustee at his creditors meeting regarding his former spouse.

had not transferred any real property within the last two years. (Ex. G-1). The Trustee had been provided with deeds recorded in 2014 showing that Abie had transferred several real properties to a "Rema Charles". At this point, the Trustee did not know who "Rema Charles" was. So understandably, the Trustee wanted to ask Abie questions about "Rema Charles" at the creditors meeting on December 8, 2015.  At the time, the Trustee had no reason to suspect that Rema Charles was Abie's former spouse, because Abie had stated in his sworn SOFA filed in this Bankruptcy Case that his former spouse was named "Ayoun Marian". (SOFA, Ex. G-1).

Abie appeared at this creditors meeting with counsel on December 8, 2015.  Abie was put under oath. The Trustee asked Abie several questions. A written transcript of this creditors meeting (with an audio recording) was admitted at trial. (Ex. G-30).

At this creditors meeting, the Trustee asked Abie several questions to try to find out who this "Rema Charles" named on the deeds from Abie was. When asked by the Trustee whether Rema Charles was a man or a woman, Abie testified that Rema Charles was a "man". When asked where Rema Charles lives, Abie testified "I don't know where he lives", and that Abie had not talked to "him for a long time."  Abie testified multiple times in the creditors meeting using male pronouns to refer to Rema Charles.[20] Abie testified that Rema Charles was a "relative". When asked what kind of relative Rema Charles was, Abie testified "just a relative". When asked for additional information, Abie testified that Rema Charles was "from the family from the wife's side."

---

[20]  At trial, it was suggested that Abie was confused and was really testifying about "Rama Charles" (his father-in-law) at the creditors meeting, and not "Rema Charles" (his ex-spouse). But at the creditors meeting, Abie testified that "Rema Charles" was not his father-in-law, and that he didn't know if "Rema Charles" had any children. (Ex-30, pp. 36-37). The Court cannot accept that Abie was confused at the creditors meeting. If Abie really was referring to his father-in law at the creditors meeting, Abie would not have testified that Rema Charles was not his father-in-law and would not have testified that Abie did not know if his father-in-law had children (obviously Rema would be a child of Abie's father-in-law).

When asked by the Trustee if Rema Charles was his wife's brother, Abie testified "maybe." Abie testified that he worked for Rema Charles doing "legal paperwork." Abie testified that he did not know if Rema Charles had any children. Then when the Trustee asked if Abie's ex-wife owned any of the real properties listed on his 2013 Bankruptcy Schedules, Abie testified "I don't know". When asked what his ex-wife's name was, Abie testified "Irmee". When asked where his ex-wife was, Abie testified he did not know. *See* Transcript, pp. 17-39 (Ex. G-30); Joint PTO ¶¶ 33-41 (dkt# 12, adv. no. 16-03005).

At trial, the Trustee credibly testified he left that December 2015 creditors meeting thinking that Rema Charles was a man. And the Court can understand why after reviewing the transcript and audio recording of the meeting. The Court concludes that Abie misled the Trustee and provided false testimony at the creditors meeting about the identity of Rema Charles. In sum, Abie testified that Rema Charles was a man, just a relative, and that Abie did not know if Rema Charles had children. This is simply false. Abie knew that Rema Charles is a woman, that Rema Charles is Abie's ex-wife, and that he and Rema Charles have four children. Abie also falsely testified that he did not know where his ex-wife was and did not accurately provide his ex-wife's real name.

In sum, the Court finds that Abie concealed the existence and identity of Rema Charles and provided false testimony at the creditors meeting. The reason why is equally obvious to the Court—Abie had transferred all of his real properties to Rema Charles and was trying to hide the fact that Rema Charles was really his ex-spouse.

### F. Consideration and Value for Transfers

Abie and Rema have admitted several times, under oath, that Abie received no consideration from Rema at the time of the transfers of the real properties to Rema. At

the creditors meeting on December 8, 2015, Abie admitted that he received no money for the transfers of real property to Rema Charles. (Ex. G-30, pp. 22-24). At trial, Abie admitted that he had not received anything of value from Rema when he transferred the real properties to Rema. Likewise, at trial and in her deposition, Rema admitted that she had not given anything of value to Abie for the transfers of the real properties.

Instead, Abie and Rema tried to convince the Court that Rema's father had paid for the real properties, and that the real properties were really purchased by Abie (using Rema's father's money) for Rema. Although this story could possibly have some truth behind it, this story was not proven at trial with any credible evidence.

Rema testified, in conclusory fashion, that her father paid for the real properties. But no amounts of money paid by the father, no dates that the money was paid by the father, no identification of which real properties were paid for by the father, or even the name of the father was provided by Rema to the Court. Then later, Rema reversed course somewhat and testified that she (Rema) was the one that paid for the properties. But, no amounts of money paid by Rema, no dates of the payments by Rema, and no identification of which real properties were provided by Rema to the Court. No bank statements were provided. No receipts of cash withdrawals or other cash transactions were provided. There was not even an estimate of the amount of money paid by Rema or her father for the real properties or even the approximate dates of such payments provided to the Court. The Court was left completely confused by this story—whether the money for the real properties was allegedly paid by Rema's father, or by Rema, or from Rema's father to Rema, or from Rema's father to Abie.

Rema also testified, in conclusory fashion, that she paid the property taxes on the properties. But probative evidence about the actual amount of amount of property taxes paid by Rema, when she paid them, or which properties she paid property taxes on, was not provided to the Court. The Court only has general, vague, and inconsistent testimony from Rema lacking credibility to support this story.

At trial, to support this story, Abie testified, in conclusory fashion, that the real properties were always Rema's properties and it was her money. Then later, Abie testified, again in conclusory fashion, that his father-in-law wanted to invest in properties for himself and Rema, and that Abie was just helping his father-in-law invest. But again, the Court was provided with no amounts of money paid by Rema or her father and no dates of the payments by Rema or her father. The Court only has general, vague, and inconsistent testimony from Abie lacking credibility to substantiate this story.

Then, there was absolutely no documentary evidence provided to the Court whatsoever to support this story. No receipts, no closing statements, no bank statements, no written agreements, no letters, not even any written notes were provided to the Court to support this story. And the father-in-law (which the Trustee and UST questioned really even existed), did not appear or testify at trial. No documentary evidence was provided that Rema paid the property taxes on the properties. No probative evidence (documentary or otherwise) was provided to establish that Rema had made and paid for any improvements on the real properties.

Instead, the probative evidence provided to the Court demonstrated that Abie was the owner of the real properties. Documents clearly establish that Abie purchased the real properties in his name. Neither Rema's name nor the name of Rema's father

are on any of the purchase documents or acquisition deeds. (Exs. G-12 through G-21). No believable and supported reason was given as to why just Abie's name (and not Rema's name) was on the deeds acquiring the real properties. Abie financed the purchase of several of the real properties—notably, Abie (not Rema or Rema's father) was the borrower on each. (Exs. G-12, G-14, G-16, G-17, G-21). During the period that the properties were purchased and paid for, Abie was a mechanic and operated a business. In contrast, Rema, according to her own testimony, only sewed clothes.

The overwhelming evidence showed that Abie (not Rema) acted as the owner of the real properties. Abie (not Rema) filed the Property Tax Suits challenging the values of several properties. (Exs. A-1 through A-5). Abie (not Rema) sometimes borrowed money to pay property taxes on several properties (Exs. G-12, G-13, G-14, G-17). In 2013, Abie filed sworn bankruptcy schedules in this Court stating that he (Abie) owned the real properties and backed it up with his sworn testimony, with no mention of Rema whatsoever. (Exs. G-8, G-29).  Abie also testified in 2013 that he personally paid the property taxes, with no mention of Rema. (Ex. G-29). At trial, Abie admitted that he personally had written checks to pay for property taxes from his bank account.

The Court has weighed the evidence and the credibility of the witnesses. The Court finds that the story that Rema's father (or Rema) somehow paid for the real properties and that Rema always owned the real properties is not credible and was not proven at trial. The Court finds that Abie was the owner of the real properties and that Abie received no consideration and no value from Rema for the real properties or the transfers of the real properties to Rema. The Court also finds that Rema did not pay property taxes and did not make or pay for any improvements to the real properties.

## IV.
## CONCLUSIONS OF LAW
## FRAUDULENT TRANSFER ADVERSARY PROCEEDING

The following constitutes the conclusions of law with legal analysis by the Court in the Fraudulent Transfer Adversary Proceeding (adv. no. 16-03002). The Fraudulent Transfer Adversary Proceeding is between the Trustee (as Plaintiff) and Rema Charles (herein "Rema") (as Defendant).[21]

The following nine real properties are the subject of the Fraudulent Transfer Adversary Proceeding brought by the Trustee against Rema: Montana 1, Montana 2, Montana 3, Montana 5, Montana 6, Jim Bridger 1, Jim Bridger 2, Horizon City, and Southside (collectively, the "Subject Properties"). *See* Joint PTO; Complaint (dkt# 18-1, dkt# 1, adv. no. 16-03002).[22] Eight of these properties were transferred directly by deed from Abie to Rema; one of the properties (Montana 6) was transferred indirectly from Abie to Rema (through their son Phil).

The Trustee seeks to avoid the transfers of the Subject Properties by Abie under either § 548(a)(1)(A) of Bankruptcy Code (called an "actual fraudulent transfer"), or § 548(a)(1)(B) of the Bankruptcy Code (called a "constructive fraudulent transfer"). Alternatively, the Trustee seeks to avoid the transfers of the Subject Properties under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), which is codified in the Texas

---

[21] Abie is not a defendant in or party to the Fraudulent Transfer Adversary Proceeding filed by the Trustee against Rema (adv no. 16-03002). Abie nonetheless filed an Answer in the Fraudulent Transfer Adversary Proceeding. (dkt# 4, adv. no. 16-03002). Abie is a defendant in and party to only the Discharge Adversary Proceeding filed by the UST against Abie (adv.no. 16-03005).

[22] At trial, the Trustee's counsel urged the Court to also consider the conveyance of the Galveston property by Abie to Rema as a recoverable fraudulent transfer. However, since Galveston was not identified in the Trustee's Complaint or the Joint PTO filed by the Trustee and Rema, the Court will not consider whether the conveyance of Galveston was a fraudulent transfer in the Fraudulent Transfer Adversary Proceeding. *See* Joint PTO, Trustee's Complaint (dkt# 18-1, dkt# 1, adv. no. 16-03002).

44

Business and Commerce Code.[23] Upon avoidance of the transfers, the Trustee seeks to recover the Subject Properties from Rema under § 550(a) of the Bankruptcy Code.

## A. Date of Transfer

To begin, the parties disagree on the applicable date of the "transfer" of the Subject Properties from Abie to Rema. In short, Rema (and Abie) contend that the date of execution and delivery of the deeds by Abie to Rema is the date a "transfer" was made of the Subject Properties. On the other hand, the Trustee contends that the date of recordation of the deeds is the date a "transfer" was made of the Subject Properties. The Trustee is correct.

Both § 548 of the Bankruptcy Code and TUFTA specifically define the date that a "transfer" of real property is made for the purposes of a fraudulent transfer action. In pertinent part, § 548(d)(1) of the Bankruptcy Code provides:

> For the purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee….

The Fifth Circuit has held that "applicable law" under § 548(d)(1) means applicable state law. *See Sandoz v. Bennett (In re Emerald Oil Co.)*, 807 F.2d 1234, 1237 (5th Cir. 1987). So, Texas state law controls the date that a transfer is made for the purposes of a fraudulent transfer suit under § 548 of the Bankruptcy Code.

TUFTA (the Texas fraudulent conveyance statute) has an almost identical definition of the date that a "transfer" of real property is made. Specifically, § 24.007(1)(A) of TUFTA provides, in pertinent part, that:

---

[23] In addition to § 548 of the Bankruptcy Code, under § 544(b), a bankruptcy trustee is granted the authority to avoid transfers of property under state fraudulent conveyance laws—in this case, TUFTA. *See, e.g.*, *Asarco LLC v. Ams. Mining Corp. (In re Asarco),* 404 B.R. 150, 156 (S.D. Tex. 2009).

(1) a transfer is made:

(A) with respect to an asset that is real property… when the transfer is so far perfected that a good faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee…

Under Texas state law, a "transfer" of real property is not perfected against a good faith purchaser until the deed is properly recorded. *See, e.g.*, *Corpus v. Arriaga*, 294 S.W.3d 629, 635-36 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (finding that a transfer of real property is perfected under Texas state law on the date of recordation of the deed, as a matter of law and applying TUFTA) (supporting citations omitted); *Moser v. Feuerbacher (In re Feuerbacher)*, No. 09-04198, 2011 WL 608122, at *4 (Bankr. E.D. Tex. Feb. 11, 2011), *aff'd*, No. 4:11-CV-272, 2012 WL 1070138 (E.D. Tex. Mar. 29, 2012) (finding that the date of recordation of a real property instrument is the date of "transfer" under §548 of Bankruptcy Code and Texas law); Tex. Prop. Code § 13.001(a) (providing that a conveyance of real property is void as to a creditor or subsequent purchaser, unless the instrument has been filed of record).

So under Texas state law, the date that a deed of real property is recorded in the public deed records is the date that a "transfer" is made and perfected against a bona fide purchaser or creditor. Because § 548 of the Bankruptcy Code provides that the date of transfer for a fraudulent transfer action is defined by state law, the date of "transfer" is the date of recordation for both a fraudulent transfer action under § 548 of the Bankruptcy Code and under TUFTA. Thus, the dates that the deeds from Abie to Rema (and Phil) were publicly recorded with El Paso County are the dates of "transfer" of the Subject Properties. The dates of the execution and delivery of the unrecorded deeds from Abie to Rema are not the dates of "transfer" for fraudulent conveyance purposes.

46

At trial and in a post-trial brief, counsel for Abie (and to some extent Rema), argued that there are a "legion" of Texas cases that hold that a deed of real property is effective when the deed is executed and delivered to the grantee—not when the deed is recorded. (dkt# 27, adv. no. 16-03002). However, none of the cited cases address the date of "transfer" of real property under fraudulent conveyance law. It is true that as between *a grantor and a grantee*, a transfer of real property can be effective upon execution and delivery of a deed, without recordation. *See* Tex. Prop. Code § 13.001(b) (an unrecorded instrument is binding on the parties to the instrument). This is not the case, however, when the rights of third parties are involved—such as a creditor, bona fide purchaser, or bankruptcy trustee. A transfer is not effective under Texas law with respect to these third parties until the deed is publicly recorded.

Texas law is far from unique in this regard. The laws of many states provide that the date the deed was recorded, and not the date of execution and delivery of the deed, is the date of the "transfer" of real property for the purpose of fraudulent conveyance law. *See, e.g.*, *In re Emerald Oil*, 807 F.2d at 1237 (applying Louisiana law); *Williams v. Marlar (In re Marlar)*, 252 B.R. 743, 758-759 (8th Cir. B.A.P. 2000) (applying Arkansas law); *Smith v. Cowden (In re Cowden)*, 337 B.R. 512, 522 (Bankr. W.D. Penn 2006) (applying Pennsylvania law).

In sum, the dates that the deeds from Abie to Rema (and Phil) were recorded with the El Paso County Clerk's office are the dates that the "transfer" of the real properties were made for the purpose of this fraudulent transfer action. Most of the deeds from Abie were recorded in late February 2014 and early March 2014— approximately two months prior to the trial in the Starr Suit against Abie. One deed

(from Abie to Phil and subsequently from Phil to Rema) was recorded in July 2014—about two months after the judgment was entered against Abie in the Starr Suit.

## B. **Actual Fraudulent Transfer**

The Trustee has sought to avoid the transfers of the Subject Properties by Abie to Rema (and Phil) under § 548(a)(1)(A) of the Bankruptcy Code and, alternatively, under § 24.005(a)(1) of TUFTA (its state law companion). In general, both statutes provide for the avoidance of transfers of property if "actual intent" by the debtor to delay, hinder or defraud a creditor is found. For this reason, this type of conveyance is often called an "actual fraudulent transfer".

In pertinent part, § 548(a)(1)(A) of the Bankruptcy Code provides:

> (a)(1) The trustee may avoid any transfer…of an interest of the debtor in property… that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>> (A) made such transfer… with **actual intent to hinder, delay, or defraud** any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted… (emphasis added).

Similarly, in relevant part, § 24.005(a)(1) of TUFTA provides:

> a transfer made…by a debtor is fraudulent, as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made…if the debtor made the transfer…
>> (1) **with actual intent to hinder, delay, or defraud any creditor of the debtor**. (emphasis added).

For the Trustee to succeed under § 548(a)(1)(A) of the Bankruptcy Code, the Trustee must prove: (1) that a transfer of property of the debtor occurred; (2) within two years of filing the bankruptcy petition;[24] and (3) with actual intent by the debtor to hinder,

---

[24]   In contrast, TUFTA has a four-year look back period, starting on the date that the transfer was made. *See* TUFTA § 24.010(a). Here, the transfers of the Subject Properties by Abie occurred in the year 2014 when the deeds were recorded, so this four-year requirement of TUFTA is easily satisfied.

delay, or defraud a creditor. Here, the Trustee readily established the first two elements. First, transfers of property of the debtor occurred—as the Subject Properties owned by Abie (the debtor) were transferred to Rema (eight properties) and to Phil (one property). Second, the transfers of property were made within two years of Abie's bankruptcy filing—as Abie's bankruptcy petition was filed on September 22, 2015 and the Subject Properties were transferred from Abie by deeds recorded in 2014.

The third and final element is that the transfers must be made by the debtor with actual intent to hinder, delay or defraud a creditor. Because the last element—the debtor's actual intent—can rarely be established by direct evidence, courts routinely look to "badges of fraud" as circumstantial evidence of the debtor's subjective intent to hinder, delay, or defraud creditors. *See Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008); *Roland v. United States*, 838 F.2d 1400, 1402-03 (5th Cir. 1998).

In the context of § 548(a)(1)(A) of the Bankruptcy Code, the Fifth Circuit has articulated the following "badges of fraud": (A) the lack, or inadequacy, of consideration received by the debtor; (B) the family, friendship, or close associate relationship of the parties; (C) the retention of possession, benefit, or use of the property; (D) the financial condition of the debtor before and after the transactions in question; (E) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (F) the general chronology of events and transactions under inquiry. *See, e.g. Soza*, 542 F.3d at 1067; *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989); *Think3 Litig. Tr. v. Zuccarello (In re Think3, Inc.)*, 529 B.R. 147, 198 (Bankr. W.D. Tex. 2015).

Similarly, TUFTA sets forth several non-exclusive statutory "badges of fraud" that a court examines to determine if the debtor had the requisite actual intent to defraud.[25] Specifically, § 24.005(b) of TUFTA provides that consideration may be given, among other factors, to whether (A) the transfer was to an insider;[26] (B) the debtor retained possession or control of the property transferred after the transfer; (C) the transfer was concealed; (D) before the transfer was made, the debtor had been sued or threatened with suit; (E) the transfer was of substantially all the debtor's assets; (F) the debtor absconded; (G) the debtor removed or concealed assets; (H) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (I) the debtor was insolvent or became insolvent shortly after the transfer was made; (J) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (K) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

A court need not find that all—or even a majority—of the badges of fraud are present to find that a debtor acted with actual intent to hinder, delay, or defraud. *See, e.g., Think3, Inc.*, 529 B.R. at 198 (supporting citations omitted). Rather, when several of these indicia of fraud are present, the court may conclude that there is a proper basis for an inference of actual fraudulent intent by the debtor. *See Soza*, 542 F.3d at 1067; *Roland,* 838 F.2d at 1403. The Fifth Circuit has also indicated that a presumption of actual fraudulent intent by a debtor can arise when the transfer is made to a relative of the debtor. *See Chastant*, 873 F.2d at 91.

---

[25] *See Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, No. 14-20526, 2016 WL 4253552, at *5-6 (5th Cir. Aug. 10, 2016) (supporting citations omitted).

[26] Section 24.002(7)(A)(i) of TUFTA defines "insider" as including a relative of the debtor.

Here, multiple—and almost all—of the "badges of fraud" were established in connection with the transfers of the Subject Properties by Abie to Rema (and Phil). As set forth in detail in the Court's Findings of Fact above, the circumstantial evidence overwhelmingly shows that Abie transferred the Subject Properties with actual intent to hinder, delay or defraud. After weighing the evidence and the credibility of the witnesses, the Court concludes that the Trustee has met his burden of proof that Abie transferred all of the Subject Properties with "actual intent" to hinder, delay, or defraud creditors, within the scope of § 548(a)(1)(A) of the Bankruptcy Code, as well as § 24.005(a)(1) of TUFTA.

The Court will summarize the "badges of fraud" that were established at trial, which are set forth in more detail in the Court's Findings of Fact above.

First, the transfers by Abie of the Subject Properties were to relatives and family members. At the time of the transfers, Rema was still Abie's spouse and had been Abie's spouse for over 20 years. At the time of the transfer, Phil was Abie's oldest son.

Second, Abie was "insolvent" at the time of the transfers of the Subject Properties—that is when the deeds were recorded. *See* Joint PTO stipulation (dkt# 18, adv no. 16-03002). With Abie's transfer of these nine real properties, Abie became financially destitute, had few remaining assets, had little income, had no way to make a living, and effectively became "judgment proof".

Third, the transfer of the Subject Properties by Abie to Rema (and Phil) was a transfer of substantially all of Abie's valuable assets. In 2013, Abie valued the Subject Properties at about $500,000 in his sworn bankruptcy schedules and testimony. Then in

2015, after Abie had transferred the Subject Properties, Abie valued his remaining assets at about $3,000.  (Exs. G- 8, G-29, G-1).

Fourth, Abie received no consideration or value for the transfers of the Subject Properties to Rema. Abie and Rema have effectively admitted several times, under oath, that Abie received nothing from Rema in exchange for the properties transferred. The story that Rema's father paid for the properties and that they were always really Rema's properties was not proven at trial and was not credible.

Fifth, the transfers of the Subject Properties to Rema were concealed by Abie— at several different levels and on multiple occasions. Abie hid the fact that Rema was his ex-spouse in this Bankruptcy Case (and his prior 2013 Bankruptcy Case) and further concealed that the real properties had been transferred to Rema. Abie testified at his creditors meeting in December 2015 in this Bankruptcy Case that Rema Charles was a "man" and "just a relative"—when Abie was being examined about the deeds he signed to Rema. Abie stated, in his initial Bankruptcy Schedules in this Bankruptcy Case, that the name of his ex-spouse was "Ayoun Marian"—which was never Rema's name and had only a slight resemblance to Rema's legal name some 12 years ago. If the evidence that Abie executed and delivered the deeds of the Subject Properties to Rema (and Phil) in 2009 through early 2012 is believed, those conveyances were repeatedly and continuously concealed. It was not until 2014—several years after their stated execution dates—that all of these conveyances were made public by recordation of the deeds. In 2013, Abie filed sworn bankruptcy schedules and provided sworn testimony to this Court that he (Abie) owned the Subject Properties, with no mention whatsoever of

52

Rema or Phil. In 2011 and 2012, Abie filed the Property Tax Suits stating that he (Abie) was the owner of most of the Subject Properties.

Sixth, the transfers of the Subject Properties by Abie were just before, and one just after, a significant adverse judgment was rendered against Abie in the Starr Suit. The deeds from Abie to Rema of eight of the Subject Properties were recorded in bunches in a two-week span (late February and early March 2014)—on the eve of trial in the Starr Suit.[27] The Starr Suit had been pending against Abie since August 2012 and Abie had already been sanctioned and thrown in jail by the state court. Abie must have been—justifiably—concerned that a significant adverse judgment may result at trial. Then, immediately after the final judgment in the Starr Suit was rendered (in May 2014), the deed from Abie to his son Phil of one of the Subject Properties (Montana 6) was recorded (in July 2014). Phil then almost immediately conveyed Montana 6 to Rema by warranty deed dated a month later (August 11, 2014). This deed from Phil to Rema was recorded on June 3, 2015. (Ex. G-17).

Seventh, Abie effectively absconded right before and after the significant judgment was rendered against him in the Starr Suit. Abie moved—multiple times and to multiple different locations. Abie lived in so many places over the three years that Abie was unwilling (or unable) to accurately provide his previous locations—even when required to do so in this Bankruptcy Case.

Eighth, the chronology of key events and the series of transactions set forth in detail in the Court's Findings of Fact above, support a finding of actual intent to defraud. Following is the short version.

---

[27] The trial in the Starr Suit was set to begin in just two months (April 2014).

Abie purchased most of the Subject Properties (in his own name) from the years 1987 through 2009, and Abie financed (in his own name) his purchase of several of the properties from third parties. The deeds executed by Abie to Rema (and Phil) of the Subject Properties were dated from 2009 to early 2012—before the Starr Suit was filed. There was no probative evidence as to the actual dates of delivery of the deeds from Abie to Rema (or Phil). Abie filed his 2013 Bankruptcy Case stating in sworn bankruptcy schedules and in sworn testimony that he (Abie) owned real properties worth over $500,000—with no mention that Rema (or Phil) were somehow really the owners of the properties. Abie also filed state court Property Tax Suits saying he (Abie) was the owner of several of the properties—again with no mention that Rema was really the owner.

Then, when it looked like the Starr Suit would not end well for Abie and the likelihood of a substantial adverse judgment was high, the deeds from Abie to Rema of the real properties suddenly get recorded (in February and March 2014). A substantial monetary judgment was then rendered against Abie in the Starr Suit (in May 2014). Immediately thereafter (within two weeks of the judgment in the Start Suit), Rema files for divorce. Rema and Abie pursue a "rush divorce" in which Abie had no role and waived any right to participation. Abie permitted Rema to take any property that she wanted through the Divorce Decree. In fact, the Divorce Decree appears to have been so rushed that most of the real property descriptions awarded to Rema are hopelessly garbled. Finally, the deed from Abie to Phil of the Montana 6 property was recorded in July 2014, immediately after entry of the Starr Judgment against Abie.

Abie proceeded to file this Bankruptcy Case in September 2015, basically saying that he had no assets. Abie proceeded to attempt to cover-up everything—by filing false

Bankruptcy Schedules and providing false testimony about Rema—his ex-wife—and the transfer of the Subject Properties.

Inescapably, these multiple "badges of fraud" demonstrate that Abie had the "actual intent" to hinder, delay, and defraud creditors by transferring the Subject Properties to Rema (and Phil).

About the only thing not shown was a direct connection between Abie and Rema's act of recording the deeds in early 2014—which effectuated the "transfer" of the Subject Properties by Abie to Rema. Given the surrounding circumstances, however, the Court draws a reasonable inference that Abie was at least indirectly involved in the recording of the deeds by Rema in early 2014.

This inference of Abie's indirect participation can be drawn from the known facts. The deeds from Abie to Rema were recorded in early 2014 on the eve of the looming trial against Abie in the Starr Suit—but the deeds were all dated before the Starrs even filed suit. By early 2014, Abie had already been sanctioned and jailed by the state court for violations of court orders, and should have been concerned that he was facing a substantial adverse judgment. Abie and Rema were both extremely upset with the Starrs in 2014, blaming the Starrs for the alleged injury to their child.

In early 2014, Abie and Rema were still married, but not living together. However, the evidence demonstrated that Abie and Rema were in communication with each other through their children at this time. At trial, Rema and Abie's testimony about their living locations and arrangements, and travel to see their children during this period, was evasive and inconsistent. Abie stated in sworn filings with this Court that he lived at an "unknown" address in Houston, Texas in the year 2014 (Ex. G-2), which is a location

close to where Rema testified she lived in 2014. Then, Rema testified that an unnamed "friend" told Rema to record the deeds in 2014; but inexplicably Rema could not name this "friend". All of this leads to the rational conclusion that Abie was, at a minimum, indirectly involved with the recording of the deeds by Rema in early 2014.

Further, most courts recognize that where the transferee (here, Rema) is in a position to control the disposition of the assets of the debtor (here, Abie), then the intent of the transferee to hinder, delay or defraud creditors will be imputed to the debtor. *See, e.g.*, *Asarco*, 396 B.R. at 369 (S.D. Tex. 2008) (supporting citations omitted); *U.S. Bank Nat'l Assoc. v. Verizon Comms., Inc.*, 892 F. Supp. 2d 934, 941 (N.D. Tex. 2012); *Jackson et al v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 445 (S.D.N.Y. 2001) (noting that in the typical case, the controlling transferee stands to gain directly by taking the debtor's property and keeping it out of the reach of creditors).

Here, even if Abie had no direct control over the recording of the deeds by Rema in early 2014—Rema (the transferee) had control over the deeds and disposition of the Subject Properties. The evidence at trial showed that Rema recorded the deeds in early 2014. And if the suggestion by Rema at trial that the deeds were actually executed and delivered by Abie to Rema way back in 2009 through 2012 was believed, Rema had control over the disposition of the real properties of Abie for many years. In any event, by early 2014, Rema had to be in possession of the deeds for Rema to have actually recorded the deeds. Rema then exercised control over the disposition of Abie's property (the Subject Properties) in early 2014 by recording the deeds to the real properties— which transferred the properties from Abie to Rema.  Rema recorded the deeds in early

2014, at a time when Rema knew of the Starr Suit against Abie and on the eve of trial in the Starr Suit against Abie.

Rema had every reason to try and keep the Subject Properties out of the reach of the Starrs. Rema knew that the Subject Properties had been purchased in Abie's name. Rema knew that the Starrs had sued Abie. Rema was extremely upset with the Starrs over the alleged incident with Rema's minor daughter. As a result, the lack of any direct connection between Abie and Rema's act of recording the deeds in 2014 does not prevent the transfers of the Subject Properties from being avoided based on "actual intent" to hinder, delay, or defraud creditors of Abie.

In sum, the evidence at trial overwhelmingly established that Abie transferred the Subject Properties with actual intent to delay, hinder, or defraud creditors within the scope of § 548(a)(1)(A) of the Bankruptcy Code, as well as § 24.005(a)(1) of TUFTA. As a result, the Court concludes that the transfers of the Subject Properties by Abie (eight properties directly to Rema and one property to Phil and then to Rema) are avoidable by the Trustee as actual fraudulent transfers.

### C. Constructive Fraudulent Transfer

The Trustee has also sought to avoid the transfers of the Subject Properties by Abie to Rema (and Phil) under § 548(a)(1)(B) of the Bankruptcy Code and, alternatively, under § 24.006(a) of TUFTA (its state law companion). Basically, both statutes permit the avoidance of a transfer of property by a debtor (regardless of a debtor's actual intent) if two requirements are satisfied. For this reason, this type of conveyance is typically called a "constructive fraudulent transfer".

In pertinent part, § 548(a)(1)(B) of the Bankruptcy Code provides:

> (a)(1) The trustee may avoid any transfer…of an interest of the debtor in property… that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>> (B)(i) received less than a reasonably equivalent value in exchange for such transfer…; and
>> (ii)(I) was insolvent on the date that such transfer was made…or became insolvent as a result of such transfer…

Similarly, in relevant part, § 24.006(a) of TUFTA provides:

> A transfer made…by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made… if the debtor made the transfer…without receiving a reasonably equivalent value in exchange for the transfer… and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer…

In substance, to establish a constructive fraudulent transfer, the Trustee must prove two requirements—(1) the debtor (Abie) received less than "reasonably equivalent value" in exchange for the transfer of the Subject Properties; and (2) the debtor (Abie) was "insolvent" on the date of the transfer, or was made "insolvent" by the transfer of the Subject Properties.[28] The Trustee has the burden of proof on both of these requirements. *See, e.g.*, *Osherow v. Nelson Hensley & Consol. Fund Mgmt., LLC (In re Pace)*, 456 B.R. 253, 267 (Bankr. W.D. Tex. 2011) (supporting citations omitted).

Here, the Trustee and Abie stipulated that Abie was "insolvent" at the time of the transfers of the Subject Properties—which is the date that the deeds were recorded. *See* Joint PTO stipulation (dkt# 18, adv no. 16-03002). As a result, one of the elements

---

[28]  The other requirements—such as the date of the transfers and that the transfers were made within two years of Abie's bankruptcy petition (§ 548(a)(1) of the Bankruptcy Code) or within four years of the date of the transfer (§ 24.010(a) of TUFTA)—have been established, as already set forth by the Court.

of a constructive fraudulent transfer—that Abie was "insolvent" at the time of the transfers—has been conclusively established.[29]

The remaining element to prove a constructive fraudulent transfer is that Abie did not receive "reasonably equivalent value" in exchange for the transfers of the Subject Properties (eight properties to Rema and one property to Phil).

The Bankruptcy Code does not define the phrase "reasonably equivalent value" for the purposes of § 548(a)(1)(B).[30] According to the Fifth Circuit, reasonably equivalent value means that the "debtor received value that is substantially comparable to the worth of the transferred property", and is judged from the standpoint of creditors of the debtor. *See, e.g.*, *Stanley v. U.S. Bank Nat'l Assoc. (In re TransTexas Gas Corp.),* 597 F. 3d 298, 306 (5th Cir. 2010) (supporting citations omitted).

Many courts have adopted a two-prong analysis to determine whether the debtor received reasonably equivalent value in exchange for the transfer. First, the court examines whether the debtor received an economic benefit at the time of the transfer. *See Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.),* 6 F.3d 1119, 1127 (5th Cir. 1993). Second, the court examines whether the value provided by the transferee was "reasonably equivalent" to the value given by the debtor. *See, e.g.*, *Think3,* 529 B.R. at 200 (quoting *Lowe v. B.R.B. Enters., Ltd. (In re Calvillo)*, 263 B.R. 214, 220 (W.D. Tex. 2000)). Whether or not the debtor received "reasonably equivalent

---

[29] The Court has also made its own findings to support the conclusion that Abie was insolvent at the time of the transfers and was made insolvent by the transfers, as set forth in the Findings of Fact above.

[30] Section 548(d)(2)(A) does define "value" as "property, or satisfaction or securing of antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor".

value" is "largely a question of fact" to which "considerable latitude" must be given to the bankruptcy court as the trier of fact. *See TransTexas,* 597 F.3d at 306.

Conversely, TUFTA does provide a statutory definition of the phrase "reasonably equivalent value". In this regard, § 24.004(d) of TUFTA provides:

> (d) "Reasonably equivalent value" includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction.

Here, the evidence at trial established that Abie (the debtor) did not receive any value or any economic benefit from Rema for the transfers of the Subject Properties. Abie and Rema both effectively admitted several times, under oath, that Abie received no consideration from Rema at the time of the transfers. At the creditors meeting on December 8, 2015, Abie admitted that he received no money for the transfers of real property to Rema Charles. At trial, Abie admitted that he had not received anything of value from Rema when he transferred the Subject Properties to Rema. Likewise, at trial and in her deposition, Rema admitted that she had not given anything of value to Abie for the transfers of the Subject Properties. Instead, Rema and Abie provided the Court with a story about how Rema's father (or Rema) originally paid for the Subject Properties. For the detailed reasons in the Findings of Fact of the Court set forth above, this story by Rema and Abie is not credible. Put simply, the transfers of the Subject Properties by Abie to Rema were not arm's length transactions and Abie did not receive any value.

There was scant evidence provided to the Court regarding the value of the Subject Properties. Abie did, however, value the Subject Properties at over $500,000 in

his 2013 Bankruptcy Schedules and in his Court testimony in August 2013.[31] (Ex. G-8, Schedule A; Ex. G-29). Coupled with the fact that Rema paid no consideration to Abie for the transfers of the properties, the Court has little trouble concluding that the value received by Abie (effectively $0), was less than "reasonably equivalent" value.

As a result, the Court concludes that Abie received less than "reasonably equivalent value" from Rema in exchange for the transfers of eight of the Subject Properties, within the meaning of § 548(a)(1)(B) of the Bankruptcy Code and § 24.004(d) of TUFTA.[32] Those eight Subject Properties—which were transferred directly from Abie to Rema—are Montana 1, Montana 2, Montana 3, Montana 5, Jim Bridger 1, Jim Bridger 2, Horizon City, and Southside.

One of the Subject Properties (Montana 6) was transferred by Abie to his son Phil (as transferee). Phil then transferred Montana 6 to his mother Rema. (Ex. G-17). At trial, there was no evidence that Phil did not provide "reasonably equivalent value" to Abie for the Montana 6 property. Phil did not testify at trial at all. And Abie and Rema testified that Rema did not provide any consideration for the transfers of properties to Rema, with no mention of Phil. Although the Court seriously doubts that Phil provided "reasonably equivalent value" to Abie for the Montana 6 property, this essential element was not proven at trial by the Trustee. The Trustee had the burden of proof and failed to meet that burden with regard to Montana 6.

As a consequence, the Court concludes that the transfer of Montana 6 by Abie to Phil is not avoidable as a "constructive fraudulent transfer". However, as set forth

---

[31] The eight Subject Properties transferred directly by Rema to Abie were valued in Abie's 2013 Bankruptcy Schedules at a total of about $461,155. (Ex. G-8, Schedule A).

[32] The Court's legal analysis of "reasonably equivalent value" in the context of the Divorce Decree, is set forth below in the section entitled "Impact of Divorce Decree".

above, the transfer of Montana 6 by Abie to Phil is avoidable as an "actual fraudulent transfer", so in the end this does not matter.

In sum, the evidence at trial established that eight of the Subject Properties (Montana 1, Montana 2, Montana 3, Montana 5, Jim Bridger 1, Jim Bridger 2, Horizon City, and Southside) were transferred to Rema while Abie was "insolvent" and that Abie received less than "reasonably equivalent value" from Rema in exchange for the transfers. As a result, the Court concludes that the transfers of these eight Subject Properties by Abie to Rema are also avoidable by the Trustee as constructive fraudulent transfers under § 548(a)(1)(B) of the Bankruptcy Code, as well as under § 24.006(a) of TUFTA. The Court also concludes that the transfer of Montana 6 by Abie to Phil is not avoidable as a constructive fraudulent transfer under either § 548(a)(1)(B) of the Bankruptcy Code or § 24.006(a) of TUFTA—due to the lack of proof that Abie received less than reasonably equivalent value from Phil for the transfer.

**D. <u>Date a Claim Arises</u>**

At closing arguments, counsel for Rema (and to some extent, Abie) raised the legal argument that because the Subject Properties were transferred by Abie to Rema *before* the Starr Judgment was actually entered against Abie on the claim made by the Starrs, there cannot be any recoverable fraudulent transfer.[33] This is simply not correct.

The basic timeline is as follows, as set forth in the above Findings of Fact by the Court. In May 2012, the dispute between Abie and the Starrs arose, when Abie towed the Starrs' motor home. In August 2012, the Starrs filed the Starr Suit against Abie in

---

[33] This legal issue was not set forth in the Joint Pre-Trial Order in the Fraudulent Transfer Adversary Proceeding (or even in the Answer filed by Rema), and thus could be considered waived. *See, e.g.*, *Kona Tech. Corp. v. S. Pac. Transp. Corp.*, 225 F.3d 595, 604 (5th Cir. 2000) (supporting citations omitted). However, in the interest of completeness, the Court will address this legal issue.

state court. In February and March 2014, the deeds from Abie to Rema of the Subject Properties were recorded—which are the dates of the "transfers" of the Subject Properties under fraudulent conveyance laws. In April 2014, trial started in the Starr Suit against Abie. In May 2014, the Starr Judgment was entered against Abie.

Section 548(a)(1)(A) of the Bankruptcy Code provides for avoidance of an "actual fraudulent transfer". In pertinent part, this statute provides that a transfer is avoidable if the debtor made the transfer with actual intent to hinder, delay, or defraud "any entity to which the debtor was or became, on or after the date that such transfer was made,…indebted". Although the term "indebted" is not defined in the Bankruptcy Code, the term "debt" is defined in the Bankruptcy Code as "liability on a claim". *See* 11 U.S.C. § 101(12). In turn, the Bankruptcy Code broadly defines "claim" as meaning "any right to payment, *whether or not such right is reduced to judgment,* unliquidated, fixed, contingent, matured, unmatured, *disputed, undisputed*, legal, equitable, secured, or unsecured". *See* 11 U.S.C. § 101(5) (emphasis added).

The Starrs held a "claim" against Abie in May 2012 when the underlying towing dispute occurred, or at the very latest, in August 2012 when the Starrs filed suit against Abie. The Starrs were creditors that had a claim against Abie before the date of the transfers of the properties by Abie to Rema in February and March 2014. At bottom, the fact that the claim of the Starrs against Abie was not reduced to a judgment before the transfers of the Subject Properties were made by Abie is not a defense to an actual fraudulent transfer under § 548(a)(1)(A) of the Bankruptcy Code.

Section 548(a)(1)(B) of the Bankruptcy Code provides for avoidance of a "constructive fraudulent transfer". This statute contains no requirement of a creditor and

is not based on the timing of a debt, claim, or judgment by a creditor. At bottom, the fact that the Starr's claim against Abie was not reduced to a judgment before the transfers of the Subject Properties were made by Abie to Rema is not a defense to a constructive fraudulent transfer under § 548(a)(1)(B) of the Bankruptcy Code.

Section 24.005(a)(1) of TUFTA provides for avoidance of an "actual fraudulent transfer" under Texas state law. In pertinent part, this statute provides that a transfer is avoidable if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor, "whether the creditor's *claim arose before or within a reasonable time after the transfer was made*" (emphasis added). In turn, § 24.002(3) and § 24.002(4) of TUFTA broadly define the terms "claim" and "creditor" in almost identical fashion as defined under the Bankruptcy Code.

Here, the Starr's claim against Abie arose in May 2012 when the underlying towing dispute occurred, or at the very latest in August 2012 when the Starrs filed suit against Abie. Both of these events occurred well before the transfers of the Subject Properties by Abie to Rema in February and March 2014. Further, the Starr Judgment was clearly entered against Abie within a "reasonable time" (May 2014) after the date of the transfers (February and March 2014). This satisfies § 24.005(a)(1) of TUFTA.

Finally, § 24.006(a) of TUFTA provides for avoidance of a "constructive fraudulent transfer" under Texas state law. In pertinent part, this statute provides that a transfer by a debtor is fraudulent as to a "creditor whose claim arose before the transfer was made". The Texas Court of Appeals recently addressed this claim requirement under TUFTA in *Corpus v. Arriaga*, 294 S.W.3d at 636. Specifically, the *Corpus* court held that the creditor's claim arose on or before the date that the creditor filed suit

against the debtor. Here, the Starrs filed suit against Abie in August 2012, and the transfers of the Subject Properties from Abie to Rema were made afterwards in February and March 2014. As a result, the claim of the Starrs against Abie clearly arose before the transfer of the properties by Abie to Rema under § 24.006(a) of TUFTA.

In sum, the Court concludes that the fact that the Subject Properties were transferred by Abie to Rema before the Starr Judgment was entered against Abie does not mean that the transfers cannot be avoided as actual or constructive fraudulent transfers under both the Bankruptcy Code and TUFTA.[34] The Starrs's claim against Abie arose in May 2012 when the underlying towing incident occurred—or at the latest in August 2012 when suit was filed against Abie—which was before the date of the transfers of the Subject Properties to Rema in February and March 2014.

### E. Section 548(c) Defense

Section 548(c) of the Bankruptcy Code sets forth a defense to avoidance of a fraudulent transfer. Here, Rema did not plead a defense to the avoidance of the transfers of the Subject Properties under § 548(c) of the Bankruptcy Code. Neither did the Joint PTO preserve any such defense. *See* Joint PTO; Answer (dkt# 18, dkt# 10, adv. no. 16-03002). As a result, any defense by Rema under § 548(c) has been waived. *See, e.g.*, *Kona Tech. Corp.*, 225 F.3d at 604 (supporting citations omitted).

Even if the Court considers a defense under § 548(c) on the merits, such defense was not proven by Rema at trial. In pertinent part, § 548(c) provides:

> (c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544…, a transferee…of such a transfer…that takes *for value and in good faith* has a lien on or may

---

[34]  The date of transfer by Abie to Phil of the Montana 6 property was July 14, 2014 (when the deed was recorded), which was shortly after the Starr Judgment was entered against Abie. The Montana 6 property was then subsequently transferred by Phil to Rema.

retain any interest transferred or may enforce any obligation incurred, as the case may be, ***to the extent that such transferee or obligee gave value*** to the debtor in exchange for such transfer…. (emphasis added)

The burden of proof under § 548(c) is on the defendant transferee (here Rema). *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 799 (5th Cir. 2002). To establish a defense under § 548(c), the transferee must prove that: (1) the transferee provided "value" for the transfer; and (2) the transferee took the property in "good faith". *Williams v. FDIC (In re Positive Health Mgmt.)*, 769 F.3d 899, 903-04 (5th Cir. 2014) (supporting citations omitted). If these two requirements are established, then the transferee must demonstrate the "extent of value" given in exchange for the transfer. The transferee has a lien on the property—or may retain an interest in the property—to the extent of any such "value". *Hannover,* 310 F.3d at 799.

The Bankruptcy Code does not provide a definition for "good faith" as used in § 548(c). In *Hannover*, the Fifth Circuit indicated that the critical inquiry is the state of mind of the transferee. *Hannover,* 310 F.3d at 799-801. More recently, the Fifth Circuit used a two-step analysis to determine "good faith". First, the court considered whether the transferee had information that that put the transferee on inquiry notice that the transferor-debtor was either insolvent or making the transfer with a fraudulent purpose. Second, once the transferee was on inquiry notice, the court addressed whether the transferee satisfied the requirement of a "diligent investigation" of the transfer. *See Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 164 (5th Cir. 2015) (published); *Horton v. O'Cheskey (In re Am. Hous. Found.)*, 544 Fed. Appx. 516, 520-21 (5th Cir. 2013) (unpublished).

As a result, the Fifth Circuit instructs a court to focus on the circumstances specific to the transfer at issue—that is, whether the transferee "should have known" of

the fraudulent intent or purpose underlying the transfer. Put simply, the "good faith" defense is not available to a transferee who knew, or should have known, of the fraudulent nature of the transfer. The credibility of the transferee is also important in determining "good faith". *See Am. Hous. Found.*, 785 F.3d at 164; *Am. Hous. Found.*, 544 Fed. App'x. at 520-21.

Applying these precepts, the Court concludes that Rema did not take the Subject Properties from Abie in "good faith". As set forth in more detail in the Court's Findings of Fact, Rema admitted that she had actual knowledge of the Starr Suit against Abie starting in the year 2012. Rema knew that she and Abie were still married at the time. Rema also knew that the Subject Properties were purchased by and held in Abie's name—not in her name. Rema knew that the Starr Suit was pending against Abie. Rema knew, or reasonably should have expected, that the Starr Suit would not end well for Abie, given that Abie had already been sanctioned and jailed by the state court.

So, over a two-week period, starting in late February 2014 through early March 2014, Rema recorded the deeds transferring the Subject Properties from Abie to Rema. Rema recorded the deeds transferring the properties from Abie to Rema with actual knowledge of the pending Starr Suit against Abie. In fact, these deeds from Abie to Rema were recorded on the eve of trial—just two months prior to trial in the Starr Suit. Rema testified that she recorded the deeds from Abie in early 2014 because a "friend" told Rema that she needed to record the deeds; but then Rema testified that she did not know the name of this "friend". Just two months after Rema recorded the deeds transferring the properties out of Abie's name and into Rema's name, the Starr Judgment was entered against Abie. The Court concludes that Rema knew, or

reasonably should have known, of the fraudulent purpose of the transfers—to get the properties out of Abie's name and into Rema's name. The Court also concludes that Rema knew, or reasonably should have known, that Abie would become insolvent as a result of these transfers because it left Abie with no valuable assets.

The inescapable conclusion is that Rema did not take the Subject Properties in "good faith" from Abie. As a result, the Court concludes that Rema does not have a defense under § 548(c) of the Bankruptcy Code.

Rema also did not prove that she took the Subject Properties for "value" and did not prove the extent that she gave "value" to Abie for the Subject Properties. These are additional—and essential—elements of a defense under § 548(c) for which Rema, as transferee, bore the burden of proof. "Value" is defined in § 548(d)(2)(A) as meaning "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." In determining and measuring "value" under § 548(c), a court examines value from the transferee's perspective—i.e., what value the transferee gave up for the transfer—rather than what value the transferor received. *See, e.g.*, *Positive Health Mgmt.*, 769 F.3d at 904 (supporting citations omitted).

Here, no probative and credible evidence was provided by Rema at trial to prove the "value" that Rema provided or gave up for the transfers of the Subject Properties. Basically, Rema tried to prove that her father had paid for the Subject Properties, and that that the properties were really purchased by Abie (perhaps using Rema's father's money) for Rema. Rema's story was not proven at trial with credible evidence, as set forth in detail in the Court's Findings of Fact. Rema testified, in conclusory fashion, that

her father paid for the real properties. Rema then later testified that she (Rema) was the one that paid for the properties. But no amounts of money paid by the father (or by Rema), no dates that the money was paid by the father (or by Rema), and no identification of which real properties were paid for by the father (or by Rema), was provided to the Court. There was not even an estimate of the amount of money paid by Rema's father (or by Rema) for the real properties or even the approximate dates of such payments. The Court was completely confused by Rema's story—whether the money for the real properties was allegedly paid by Rema's father, or by Rema herself, or from Rema's father to Rema, or from Rema's father to Abie. No documentary evidence of any kind was provided to the Court to support this story—no bank statements, no receipts, no closing statements, no written agreements, and not even any handwritten notes.

In contrast to this story, Abie testified that Rema had paid him no money for the transfers of the Subject Properties. And Rema, at trial and in deposition, admitted that she had not given anything of value to Abie for the transfers of the real properties.

The inevitable conclusion the Court draws is that Rema did not take the Subject Properties for "value" and that Rema did not prove the extent of any "value" allegedly given by Rema in exchange for the transfers of the Subject Properties. For these reasons as well, the Court concludes that Rema does not have a defense under § 548(c) of the Bankruptcy Code.

In sum, any defense of Rema under § 548(c) of the Bankruptcy Code has been waived by Rema as such defense was not included in the Joint PTO (or even Rema's Answer). Even if the Court considers such defense on the merits, Rema did not prove

by credible evidence that she took the Subject Properties from Abie in "good faith", that she took the Subject Properties for "value", and the extent that she gave "value" for the Subject Properties, as required by § 548(c) of the Bankruptcy Code.[35]

## F. Section 550 Recovery from Rema and Related Defenses

The Court has already concluded that the Trustee is entitled to avoid the transfers of the Subject Properties made by Abie to Rema (and Phil) under § 548 of the Bankruptcy Code and under TUFTA. These are the so-called "avoidance" statutes.

Section 550 of the Bankruptcy Code sets forth the so-called "recovery" statute, once a transfer is avoided.  Specifically, § 550(a) provides, in pertinent part, as follows:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544…548… of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> (2) any immediate or mediate transferee of such initial transferee.

Under § 550(a), a trustee can either recover the property that was fraudulently transferred by the debtor, or the value of the property that was transferred. Here, the Trustee seeks to recover the Subject Properties fraudulently transferred by Abie.

Section 550(a) also specifies from whom—i.e., the person—the property can be recovered. In substance, § 550(a)(1) allows for recovery of property from the "initial transferee". Rema was the "initial transferee" of eight of the Subject Properties— Montana 1, Montana 2, Montana 3, Montana 5, Jim Bridger 1, Jim Bridger 2, Horizon

---

[35]  Section 24.009 of TUFTA also provides "good faith" for "value" defenses by a transferee to the avoidance of a fraudulent transfer. Any defenses under TUFTA have also been waived by Rema, as no TUFTA defenses were set forth in the Joint PTO or Answer. Even if the Court considered these defenses under TUFTA, Rema is not entitled to the defenses as Rema did not prove that she took the Subject Properties in "good faith" and for "value", for the reasons set forth in this Consolidated Opinion.

City, and Southside—as the transfers of these eight properties were made directly by Abie to Rema. Therefore, the Court concludes that the Trustee is entitled to recover these eight properties from Rema under § 550(a)(1) of the Bankruptcy Code.

However, one of the Subject Properties—Montana 6—was transferred by Abie to his son Phil, and then by son Phil to mother Rema. The Court has already found that the transfer of the Montana 6 property by Abie to Phil is avoidable as an actual fraudulent transfer under § 548(a)(1)(A) of the Bankruptcy Code, as well as § 24.005(a)(1) of TUFTA.

With respect to the Montana 6 property—Phil was the "initial transferee" under § 550(a)(1), as Abie (the debtor) deeded this property to Phil. (Ex. G-17). In substance, § 550(a)(2) of the Bankruptcy Code permits recovery of property from an "immediate transferee" of the "initial transferee". Here, Rema was the "immediate transferee" of the Montana 6 property—as Phil (the "initial transferee" from Abie), turned around and transferred the Montana 6 property to Rema by deed. (Ex. G-17). As a result, the Court concludes that Trustee may recover the Montana 6 property from Rema under § 550(a)(2) because Rema is the "immediate transferee" of such property.

Rema has argued that this Court does not have jurisdiction over the Montana 6 property—because this property was transferred to Phil by Abie and Phil has not been sued and is not a party to the Fraudulent Transfer Adversary Proceeding. The Court must reject this argument by Rema.

First, § 550(a) expressly permits a trustee to recover property from an "initial transferee" like Phil (§ 550(a)(1)), **or** an "immediate transferee" like Rema (§ 550(a)(2)). Nothing in § 550 (the recovery statute) or § 548 (the avoidance statute) requires that an

initial transferee must be a party to a suit to avoid, and then recover, a fraudulent transfer. Simply put, avoidance under § 548 refers to a "transfer" (not a party), and § 550 sets forth the "party" against whom an avoided transfer may be recovered—which is either the initial transferee or a subsequent immediate transferee of the property.

Second, judicial precedent reflects this interplay between § 548 (avoidance of a transfer) and § 550 (recovery of a transfer). The majority of cases hold that a trustee is not required to file suit against the initial transferee of property to recover the property from a subsequent or immediate transferee. *See, e.g.*, *S. Cali. Sunbelt Developers, Inc. v. Northern (In re Int'l Admin. Servs., Inc.),* 408 F.3d 689, 704-06 (11th Cir. 2005) (noting that once a trustee proves that an avoidable transfer exists, the trustee can "skip over the initial transferee and sue the next in line"); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 501 B.R. 26, 33-34 (S.D.N.Y. 2013); *Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)* 389 B.R. 721, 734 (B.A.P. 9th Cir. 2008); *see also* 5 Collier on Bankruptcy ¶ 550.02[1] (16th ed. 2016) (stating that the view adopted by the majority of courts is that a transfer may be found avoidable and a recovery made from a subsequent transferee, without suing the initial transferee).

So, it is not necessary for the Trustee to have sued Phil to enable the Trustee to recover the Montana 6 property from Rema. The transfer of the Montana 6 property by Abie to Phil has been found by the Court to be an avoidable fraudulent transfer. The Trustee may sue the immediate transferee of the property (Rema) under § 550(a)(2) to recover the Montana 6 property, without suing the initial transferee (Phil).

Next, Rema has raised and pled the defense that she took the Montana 6 property from Phil in "good faith" and "without knowledge" of the voidability of the transfer. In this regard, § 550(b) of the Bankruptcy Code provides as follows:

> (b) The trustee may not recover **under section (a)(2)** of this section from—
>> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
>> (2) any immediate or mediate good faith transferee of such transferee.**(emphasis added)**.

Because this § 550(b) defense applies only to a § 550(a)(2) transferee—i.e, an immediate transferee of property—the Court need only analyze this particular defense of Rema with regard to the Montana 6 property. Rema was the immediate subsequent transferee of the Montana 6 property; Phil was the initial transferee.[36]

Rema, as the immediate transferee, bears the burden of proof under § 550(b) to establish that the property was taken: (1) for value; (2) in good faith; and (3) without knowledge of the voidability of the transfer. *See, e.g.*, *Faulkner v. Fornman (In re The Heritage Org., LLC)*, 413 B.R. 438, 496 (Bankr. N.D. Tex. 2009). [37]

Some courts conflate the "good faith" and "knowledge" requirements under § 550(b)(1) of the Bankruptcy Code into a single inquiry. *See, e.g.*, *Cage v. GDH Int'l, Inc. (In re Great Gulfcan Energy Tex., Inc.)*, 488 B.R. 898, 914 (Bankr. S.D. Tex. 2013) (supporting citations omitted). In the context of § 550(b)(1) of the Bankruptcy Code, "knowledge" of the voidability of the transfer means that the transferee knew facts that

---

[36] Rema was the "initial transferee" from Abie of the other eight Subject Properties and thus the defense under § 550(b) is not available to Rema with regard to those eight properties. Rema's "good faith" defense as an initial transferee of these eight properties under § 548(c) is analyzed by the Court above.

[37] The Bankruptcy Code does not expressly define "value" for the purposes of § 550(b)(1). *See Matter of Still*, 963 F.2d 75, 76 (5th Cir. 1992). However, § 548(d)(2)(A) defines "value", and courts have applied this definition to § 550(b)(1). *See Heritage Org., LLC*, 413 B.R. at 496.

"would lead a reasonable person to believe" that the transfer was avoidable. *See Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*, 239 F.3d 365 (5th Cir. 2000) (unpublished) (citing *CCEC Asset Mgmt. Corp. v. Chem. Bank (In re Consol. Capital Equities Corp.)*, 175 B.R. 629, 638 (Bankr. N.D. Tex. 1994)). A transferee may not "close its eyes" to suspicious facts or circumstances of the transfer and still seek protection under § 550(b)(1). *See Great Gulfcan,* 488 B.R. at 914 (supporting citations omitted).

Whether a transferee had knowledge of the voidability of the transfer and acted in good faith is a question of fact. *Southmark Corp.*, 239 F.3d at 365 (supporting citations omitted). For example, the Fifth Circuit in *Southmark* found that the record was "replete with evidence indicating knowledge" on the part of the transferee that the debtor transferor was on the brink of filing for bankruptcy protection and was in financial distress. As such, the transferee had the requisite knowledge to preclude the transferee from successfully claiming the good faith defense under § 550(b)(1).

Here, the Court concludes that Rema did not establish a defense under § 550(b) of the Bankruptcy Code to the recovery of the Montana 6 property. Rema did not prove, by probative and credible evidence, that she took the Montana 6 property in "good faith" from Phil and "without knowledge" of the voidability of the transfer from Abie to Phil.

Instead, the evidence showed exactly the opposite. On July 14, 2014—shortly after the Starr Judgment was rendered against Abie in May 2014—the Montana 6 property was transferred by Abie to Phil (his son) by recorded deed. Phil then turned around and transferred the Montana 6 property to Rema by warranty deed dated only one month later (August 11, 2014), which was recorded on June 3, 2015. (Ex. G-17).

By this time, Rema knew that Abie was in severe financial distress and that Abie had a large judgment against him in the Starr Suit. Rema also knew that the Montana 6 property had been transferred from Abie to Phil. The transfers of the Montana 6 property (from Abie to Phil and then Phil to Rema) were nearly contemporaneous transactions solely between family members, which occurred immediately after the large Starr Judgment was entered against Abie. A reasonable person could deduce that the transfer from Abie to Phil was voidable or might be voidable. As such, Rema did not prove, by credible evidence, that she received the Montana 6 property from Phil in "good faith" and "without knowledge" of the voidability of the transfer.

Further, there was no evidence that Rema provided any "value" to Phil for the transfer of the Montana 6 property. Instead, the evidence showed that Phil was the son of Rema, and that the transfer of the Montana 6 property was solely between the family (from father Abie to son Phil, and then from son Phil to mother Rema).

As a result, Rema did not meet her burden of proof to establish a defense under § 550(b) to recovery of the Montana 6 property from Rema. Rema did not prove, by credible evidence, that she took the Montana 6 property in "good faith" and "without knowledge" of the voidability of the transfer—both of which are essential elements of a § 550(b) defense. And Rema did not prove that she provided any "value" for the Montana 6 property—another essential element of a § 550(b) defense.

Finally, Rema contends that she made "improvements" to the Subject Properties. In this regard, § 550(e) of the Bankruptcy Code provides in pertinent part as follows:

> (1) A good faith transferee from whom the trustee may recover under subsection (a) of this section has a lien on the property recovered to secure the lesser of—

(A) the cost, to such transferee, of any such improvements made after the transfer…; and

(B) any increase in the value of such property as a result of such improvement, of the property transferred.

(2) In this subsection, "improvement" includes—
(A) physical additions or changes to the property transferred;
(B) repairs to such property;
(C) payment of any tax on such property;
(D) payment of any debt secured by a lien on such property…and
(E) preservation of such property.

Rema, as the transferee of the Subject Properties, bears the burden of proof to establish a defense under § 550(e). *See Kaler v. Slominski (In re Keeley & Grabinski Land P'ship),* 531 B.R. 771, 779 (B.A.P. 8th Cir. 2015), *aff'd,* No. 15-2334, No. 15-2405, 2016 WL 4205926 (8th Cir. Aug. 10, 2016).

There are multiple reasons that Rema is not entitled to a lien on the Subject Properties for any "improvements" under § 550(e). First, only a "good faith transferee" is entitled to a lien for improvements. The Court has already found that Rema did not take the Subject Properties from Abie (and Phil) in "good faith"; so a § 550(e) defense is not even available to Rema. *See, e.g.*, *Pace,* 456 B.R. at 279.

Second, Rema provided no credible evidence of the "cost" of any "improvements" to the Subject Properties. At best, there was only general and conclusory testimony that Rema paid an unstated amount of property taxes on unspecified properties. This was contradicted by the probative evidence that showed that Abie paid the property taxes.

Third, § 550(e) only applies to improvements made after the date of "transfer"; here, the "transfer" of the Subject Properties to Rema occurred in February and March 2014. There was no credible evidence that Rema made any "improvements" to the Subject Properties after February and March 2014, or at any time.

Finally, there was no credible evidence that Rema paid for any physical additions, changes, or repairs to the Subject Properties, for any secured debt on the Subject Properties, or for any preservation of the Subject Properties. Likewise, there was no credible evidence of the actual cost incurred by Rema for any such improvements or the dates such costs were incurred. The Court concludes that Rema is not entitled to a lien for any "improvements" to the Subject Properties under § 550(e).

In sum, the Court concludes that all of the Subject Properties are recoverable by the Trustee from Rema under § 550 of the Bankruptcy Code. Eight of the Subject Properties are recoverable from Rema under § 550(a)(1), as Rema was the "initial transferee" of such properties from Abie. One of the properties (Montana 6) is recoverable from Rema as the "immediate transferee" under § 550(a)(2). Phil was the "initial transferee" from Abie of the Montana 6 property and Rema is the "immediate transferee" from Phil. It is not necessary for the Trustee to have sued Phil to recover the Montana 6 property from Rema. Finally, Rema did not prove a defense to recovery under § 550(b) and or the right to a lien for any improvements under § 550(e).

### G. Impact of Divorce Decree

Rema and Abie were divorced pursuant to a Divorce Decree entered by the state court in September 2014, in a Divorce Proceeding filed by Rema against Abie. At least some of the Subject Properties were awarded to Rema in the Divorce Decree.

Now in this suit, Rema points out that the Subject Properties were transferred from Abie to Rema under the Divorce Decree entered by the state court. Rema argues that the Divorce Decree includes a finding by the state court that the award is a "just and right division of the parties' marital estate, having due regard for the rights of each

party and the children of the marriage". *See* Divorce Decree, p. 27 (Ex. G-25). At trial, Rema (and to some extent Abie) argued that the award of the properties to Rema by the state court in the Divorce Decree is entitled to preclusive effect and cannot be collaterally attacked by the Trustee in this Fraudulent Transfer Adversary Proceeding.

Although not briefed or expressly mentioned by either Rema or Abie, the key Fifth Circuit decision regarding the impact of a divorce decree in a fraudulent transfer suit is *Ingalls v. Erlewine (In re Erlewine)*, 349 F.3d 205 (5th Cir. 2003). In *Erlewine*, a bankruptcy trustee filed suit against the debtor's former spouse to avoid the transfer of property awarded to the former spouse in a contested divorce action. The trustee in *Erlewine* sought to recover the property awarded as a "constructive fraudulent transfer" under § 548(a)(1)(B), because of an unequal property division in the divorce decree.

On appeal to the Fifth Circuit, the former spouse in *Erlewine* argued that collateral estoppel, res judicata, and the *Rooker-Feldman* doctrine precluded the bankruptcy trustee from re-litigating or challenging the division of property by the state court. On this point, the Fifth Circuit flatly rejected the former spouse's argument. In short, the Fifth Circuit found that the bankruptcy trustee was not a party to the state court divorce action, and that the trustee was not in privity with any party (such as the debtor) to the divorce action. The Fifth Circuit recognized that the interests of a debtor in a divorce action and the interests of a bankruptcy trustee in a fraudulent transfer suit are quite different. The Fifth Circuit also noted that a bankruptcy trustee is a general representative of creditors. As a result, the Fifth Circuit held that collateral estoppel, res judicata, and the *Rooker-Feldman* doctrine ***do not*** bar the bankruptcy trustee from

pursuing a fraudulent transfer action against the former spouse for property awarded and transferred in the divorce decree. *Erlewine*, 349 F.3d at 209-211.

So, for the same reasons set forth by the Fifth Circuit in *Erlewine*, this Court must reject Rema's argument that the Divorce Decree has preclusive effect and that the Trustee is collaterally estopped from suing Rema to recover the Subject Properties as fraudulent transfers. The Trustee was not a party to the Divorce Proceeding brought by Rema against Abie, and the Trustee was not in privity with any party.

But this is not the end of the matter. The Fifth Circuit in *Erlewine* went on to hold that the bankruptcy trustee could not challenge the unequal division of marital property in the divorce action as a "constructive fraudulent transfer". In sum, the Circuit found that the debtor obtained "reasonably equivalent value" from the former spouse as a matter of law in the divorce action that divided marital property, based on the facts in the *Erlewine* case. Since a required element of a constructive fraudulent transfer suit under § 548(a)(1)(B) is that a debtor have received *less than* "reasonably equivalent value", the bankruptcy trustee could not sue the debtor's former spouse to recover the division of property in the divorce action. *Erlewine*, 349 F.3d at 211-13.

At first blush, the *Erlewine* decision appears to support Rema's position that the Trustee cannot avoid and recover any of the Subject Properties awarded to Rema in the Divorce Decree as fraudulent transfers.[38] Upon closer examination however, the Court concludes that *Erlewine* does not control in this Fraudulent Transfer Adversary Proceeding brought by the Trustee against Rema, for multiple independent reasons.

---

[38]  As pointed out by the Court in the Statement of Facts, the legal descriptions in the Divorce Decree are so tortured that the Court can only conclude that three of the nine Subject Properties were clearly awarded to Rema in the Divorce Decree—the remaining properties are far too unclear.

First, the Fifth Circuit in *Erlewine* dealt with a trustee's suit to avoid a "constructive fraudulent transfer" under § 548(a)(1)(B) of the Bankruptcy Code—where a debtor must have received "less than reasonable equivalent value" as a required element of a successful avoidance action. Here, the Trustee has also sought to avoid the transfers of the Subject Properties by Abie to Rema as "actual fraudulent transfers" under § 548(a)(1)(A) of the Bankruptcy Code, and § 24.005(a)(1) of TUFTA—the state law companion to § 548(a)(1)(A). Whether a transfer can be avoided as an "actual fraudulent transfer" turns primarily on non-exclusive "badges of fraud". The lack of adequate value received by a debtor is but one of many badges of fraud considered in an "actual fraudulent transfer" suit, and is not a required element.

As set forth above, the Court has determined that the Trustee can avoid the transfer of the Subject Properties to Rema by Abie as an "actual fraudulent transfer", based on the existence of multiple badges of fraud. As a result, the holding of the Fifth Circuit in *Erelwine*, which addressed only a "constructive fraudulent transfer", does not prevent the Trustee from avoiding the transfer of the Subject Properties to Rema as an "actual fraudulent transfer".

Second, in *Erlewine*, the bankruptcy trustee was directly challenging the award of the debtor's property in a divorce decree as the fraudulent "transfer" to be avoided. The debtor in *Erlewine* did not make a transfer of property to the former spouse before the award and division of property in the divorce decree.[39] Here, Abie voluntarily transferred the Subject Properties to Rema by deeds *before* the Divorce Decree was entered and

---

[39]  Since the Subject Properties were transferred by Abie to Rema by deeds recorded *before* the Divorce Decree was entered, it seems axiomatic that the Subject Properties could not have been transferred to Rema a second time in the Divorce Decree. Our situation is unlike *Erlewine*, where the parties stipulated that the divorce decree effectuated the "transfer" sought to be avoided by the trustee. 349 F.3d at 211.

before the Divorce Proceeding was even filed by Rema. The Subject Properties were transferred by Abie to Rema through deeds signed by Abie and recorded in February and March 2014—before the Divorce Decree was entered in September 2014 and even before the Divorce Proceeding was filed by Rema in May 2014.[40] In the present case, the Trustee is challenging the "transfer" of the Subject Properties made by the deeds signed by Abie to Rema; the Trustee is not directly attacking the subsequent award by the state court in the Divorce Decree as the fraudulent "transfer".

It would be an untenable (and unfounded) legal principle that would permit a debtor (like Abie) to voluntarily transfer away his property by deed to his spouse, and then somehow later "immunize" those transfers from attack as fraudulent transfers through a subsequent uncontested Divorce Decree.[41] This cannot be what the Fifth Circuit intended (and is far beyond what was even addressed) in the *Erlewine* decision.

Third, the divorce action in *Erlewine* and the Divorce Proceeding between Abie and Rema are at opposite ends of the spectrum. In *Erlewine*, the divorce and award were hotly contested by the debtor and non-debtor spouse and actively litigated in a state court trial that lasted several days. At the conclusion of the trial, the state court entered a divorce decree which granted ownership of more than 50% of the marital property to the non-debtor spouse. The state court in *Erlewine* specifically justified its disproportionate division of property in the divorce on several grounds, including that the debtor-spouse had used a significant amount of community funds on drug treatment

---

[40] One of the Subject Properties (Montana 6) was transferred by Abie to Phil (his son) on July 14, 2014 (before the Divorce Decree was entered), and was then transferred by Phil to Rema.

[41] Indeed, under Texas state law, a court in a divorce action has no power to disturb the rights that creditors lawfully have against one of the parties to the divorce, or to award property to a creditor's prejudice. *See, e.g.*, *Glasscock v. Citizens Nat'l Bank*, 553 S.W.2d 411, 413 (Tex. Civ. App.—Tyler 1977, *writ ref'd n.r.e.*) (supporting citations omitted).

and unnecessary prescription drugs and had taken unreasonable positions in the divorce action that drove up the expense of the divorce. The debtor in *Erlewine* had not "volunteered" to take fewer assets in the divorce, according to the Fifth Circuit. *Erlewine,* 349 F.3d at 207-08, 212.

Nothing even close to this happened in the Divorce Proceeding filed by Rema against Abie. The Divorce Proceeding and attendant Divorce Decree were completely uncontested by Abie. Abie waived notice of the Divorce Proceeding, agreed that the Divorce Proceeding could be taken up by the state court without further notice to Abie, and waived the making of a record. The Divorce Decree states that Rema and her counsel appeared at a hearing on September 8, 2014. Abie did not appear at the hearing. The Divorce Decree has boilerplate language about a "just and equitable division" of properties, with no specific findings by the state court to justify the grossly unequal division of property between Abie and Rema. The Divorce Decree and the docket in the Divorce Proceeding indicate that the Divorce Decree was an "Agreed Judgment", and only Rema signed the Divorce Decree. Abie effectively "volunteered" to take fewer assets and let Rema take whatever property she wanted.

Finally, the Fifth Circuit did not paint with a broad brush in *Erlewine*. Rather, the Fifth Circuit tailored its holding by stating:

> We are not sure that *Besing*[42] sweeps so broadly as always to prevent a Trustee from challenging a divorce decree under § 548(a)(1)(B) [a constructive fraudulent transfer]. But in this case the only thing the Trustee can say by way of challenge to the property settlement provided by the divorce decree is that the state court divided the community assets

---

[42]   The Fifth Circuit based its holding in *Erlewine* in part on the prior Fifth Circuit decision in *Besing v. Hawthorne (In re Besing)*, 981 F.2d 1488 (5th Cir. 1993). In *Besing*, the Fifth Circuit found that a state court judgment against the debtor dismissing a debtor's claims for discovery abuse, was a "transfer" of the debtor's property for "reasonably equivalent value" as the state court had effectively appraised the debtor's claims as valueless.

unevenly. ***Whatever concerns that might arise in other cases, the divorce before us—which was fully litigated, without any suggestion of collusion, sandbagging, or indeed any irregularity***—should not be unwound by federal courts merely because of its unequal division of marital property.  [added] (emphasis added in bold). 349 F.3d at 212-3.

The "concerns" anticipated by the Fifth Circuit in *Erlewine* are now present in this case. Here, the Divorce Decree awarding properties to Rema was not litigated at all. Here, Abie sandbagged in the Divorce Proceeding and ignored and waived all of his rights in the Divorce Proceeding. Here, there were significant irregularities in the Divorce Proceeding filed by Rema against Abie. Here, the timing of events surrounding the Divorce Proceeding smacks of collusion and mischief. Here, the Trustee is not directly challenging the Divorce Decree based on unequal division of assets—the Trustee is seeking to recover the Subject Properties fraudulently transferred by Abie to Rema by deeds before the Divorce Decree was even entered.  Here, Rema is trying to use the uncontested Divorce Decree as an after-the-fact shield to protect the prior fraudulent transfers of the Subject Properties by Abie to Rema.

The Court has set forth in detail the very peculiar circumstances surrounding the Divorce Proceeding filed by Rema against Abie and the attendant Divorce Decree in its Findings of Fact above. Following is just a summary. Rema and Abie had been married for over 20 years, and separated since 2009 (according to Rema). Then suddenly in May 2014, Rema filed the Divorce Proceeding against Abie—Rema filed for divorce within two weeks after the large Starr Judgment was rendered against Abie. Less than a month later, Abie waived notice and agreed that the Divorce Proceeding could be taken up by the court without further notice to Abie and without the creation of any record. Abie did not appear at the hearing (assuming one really occurred) in the Divorce Proceeding on September 8, 2014. Abie "sandbagged" in the Divorce Proceeding—he

did not contest the award of property in the divorce in any manner. Instead, Abie just let Rema be awarded whatever property she wanted in the Divorce Decree.

There are numerous irregularities in the Divorce Proceeding and entry of the Divorce Decree. This was a "rush" divorce pushed by Rema—the divorce petition was filed by Rema against Abie immediately after the Starr Judgment was entered against Abie. The Divorce Decree was submitted for entry by Rema to the state court in August 2014, soon after the statutorily required waiting period.[43] The Divorce Decree was so hastily drafted and signed by Rema that the decree contains inaccurate and garbled legal descriptions of the real properties awarded. The Divorce Decree and the docket in the Divorce Proceeding state that the Divorce Decree was an "Agreed Judgment", yet only Rema signed the Divorce Decree. The Divorce Decree purported to award (at least some) of the Subject Properties to Rema in September 2014; yet Abie had already conveyed these real properties to Rema earlier by deeds recorded by Rema in February and March 2014. There are additional irregularities showing the haste in the divorce— such as incorrectly listing Abie's name as "Able"—and other significant irregularities— such as the inaccurate and incomprehensible real property descriptions.

To the Court, it is evident that this case presents the exact concerns that the Fifth Circuit forecast in the *Erlewine* decision. Equally evident is that this is the type of case that the Fifth Circuit expressly stated would not be controlled by its holding in *Erlewine*.

In sum, the Divorce Decree awarding Abie's properties to Rema entered in state court does not have preclusive effect in this Fraudulent Transfer Adversary Proceeding.

---

[43]  Notably, nothing contained in the Divorce Decree or the limited records in the Divorce Proceeding reflects that the rights of creditors of Abie (a party to the divorce) was taken into account in dividing property and awarding property to Rema—such as the over $400,000 judgment against Abie rendered in the Starr Suit just a few months earlier.

The Fifth Circuit decision in *Erlewine* does not impact or prevent the Trustee from avoiding the transfers by Abie to Rema for a host of reasons. The Trustee has successfully established that the transfers of the Subject Properties by Abie to Rema are avoidable as "actual fraudulent transfers", and not just "constructive fraudulent transfers". The Divorce Decree awarding properties to Rema was entered after Abie had already voluntarily transferred the Subject Properties to Rema by recorded deeds, and this later uncontested Divorce Decree cannot be used to immunize the fraudulent transfers which had already been made. The Divorce Decree was uncontested by Abie, who effectively volunteered to let Rema be awarded any properties that she wanted. Finally, Abie sandbagged in the Divorce Proceeding, which was a rush divorce pushed by Rema immediately after a large judgment was rendered against Abie and resulted in a Divorce Decree that contains several irregularities.

### H. Impact of Property Tax Suits

At trial, Abie (and to some extent Rema) argued that the dismissal by the state courts in September 2014 of several Property Tax Suits filed by Abie has preclusive effect and collaterally estopped the Trustee from contesting the fact that Rema (not Abie) owned five of the Subject Properties. The details regarding these Property Tax Suits are set forth above in the Findings of Fact by the Court.

In short, in 2011 and 2012, Abie filed the Property Tax Suits in state court contesting the tax valuation of five real properties. Abie was the plaintiff and the El Paso Central Appraisal District ("CAD") was the defendant in such suits. The Property Tax Suits lingered for several years after their filing. Then, in May 2014, the CAD filed motions to dismiss all five of the suits, asserting that the properties had been transferred

from Abie to Rema and that, as a result, Abie lacked standing to pursue the suits. The CAD based these motions to dismiss on the warranty deeds from Abie to Rema, which just had been recorded in the public records in March 2014. So, in September 2014, the state courts entered orders dismissing the Property Tax Suits filed by Abie, finding that Abie was not the owner of these properties and had no standing to bring the suits.

For several reasons, the Court concludes that the dismissal of these Property Tax Suits by the state courts does not have preclusive effect in this Fraudulent Transfer Adversary Proceeding that Rema (and not Abie) owned these five real properties.

First, the recording of the deeds from Abie to Rema in March 2014 is what caused these Property Tax Suits to be dismissed by the state courts. It is easy to see what transpired and why from review of the pleadings and orders in such suits, as detailed by the Court in the above Findings of Facts.

Second, Abie and CAD were the parties to the Property Tax Suits. The Trustee was not a party to these Property Tax Suits and is not in privity with Abie. Rema was not a party to these suits and is not in privity with any party to the suits.  As a result, the doctrine of collateral estoppel and other preclusive doctrines do not apply. *See, e.g.*, *Erlewine*, 349 F.3d at 210 (supporting citations omitted).

Third, the interests of Abie in the Property Tax Suits and the interests of the Trustee in this Fraudulent Transfer Adversary Proceeding against Rema are distinct. The Trustee is a general representative of creditors of Abie. As a result, collateral estoppel and other preclusive doctrines based on dismissal by the state courts of the Property Tax Suits do not apply to this fraudulent transfer avoidance action brought by the Trustee. *See, e.g.*, *Erlewine*, 349 F.3d at 210 (supporting citations omitted).

Finally, to the extent that Rema attempts to rely on any collateral estoppel defense based on the Property Tax Suits, such defense has been waived by Rema. Rema did not plead the defense of collateral estoppel based on the Property Tax Suits in her Answer, and the Joint PTO did not mention or preserve any collateral estoppel defense. *See* Joint PTO; Answer (dkt# 18, dkt# 10, adv. no. 16-03002). As a result, any collateral estoppel defense by Rema in the Fraudulent Transfer Adversary Proceeding based on the Property Tax Suits has been waived. *See, e.g.*, *Kona*, 225 F.3d at 604.

In sum, collateral estoppel based on the Property Tax Suits is not a defense to the Trustee's action to avoid and recover the Subject Properties from Rema as fraudulent transfers.

## I. Unclean Hands Defense

Lastly, Rema has raised a defense of "unclean hands" to the Trustee's suit to avoid the transfers of the Subject Properties as fraudulent transfers. This defense is based on Rema's allegation that one of the Starrs caused severe emotional harm to one of Rema's children, and that the Starrs (as creditors in Abie's Bankruptcy Case) would be unjustly enriched by using the Trustee to seize and take Rema's properties. *See* Joint PTO (dkt# 18, adv. no. 16-03002).

To begin with, Rema's allegation that the Starrs caused emotional harm to one of Rema's children was not proven at trial, nor could it be. The Starrs are not parties to this Fraudulent Transfer Adversary Proceeding—only the Trustee and Rema are parties. According to the Joint PTO filed by Rema in this adversary proceeding, Mr. Starr is a defendant in a separate suit that is still pending in the U.S. District Court regarding this alleged incident. *See* Joint PTO (dkt# 18, adv. no. 16-03002).

Second, the Trustee is not bringing this suit against Rema on behalf of the Starrs. Instead, the Trustee is a general representative of all creditors of Abie and the bankruptcy estate of Abie. *See, e.g.*, *Erlewine*, 349 F.3d at 210 (supporting citations omitted); 11 U.S.C. § 323(a). The Bankruptcy Code authorizes the Trustee, for the benefit of the bankruptcy estate of Abie (not any particular creditor), to recover the Subject Properties from Rema upon avoidance of the transfers of the Subject Properties by Abie to Rema. *See* 11 U.S.C. § 550(a).

Third, the fact that a child of a recipient of a fraudulent transfer (Rema) may have an unliquidated and disputed claim against a creditor of the bankruptcy estate (the Starrs), is no basis for a defense by the recipient of the fraudulent transfer (Rema). Although the Court is very sympathetic to Rema's overall situation, this strained position is like mixing apples and oranges.

Finally, Rema cites to no legal authority for the startling proposition that unclean hands by one creditor of a bankruptcy estate (the Starrs), is a defense to recovery of a fraudulent transfer by a bankruptcy trustee for the benefit of the bankruptcy estate. Not surprisingly, the Court could find no legal authority for such a proposition. *See also Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners),* 521 B.R. 134, 169 (Bankr. N.D. Tex. 2004) (finding no legal authority for the proposition that unclean hands is a defense to a fraudulent transfer suit). Section 550 of the Bankruptcy Code sets forth several defenses to recovery of fraudulent transfers, and "unclean hands" by one creditor of the bankruptcy estate is not one of those defenses.

In sum, the Court concludes that Rema's allegation of "unclean hands" by a creditor of the estate (the Starrs) is not a defense to the Trustee's fraudulent transfer action to avoid and recover the Subject Properties from Rema.

### J. Conclusion

In conclusion, and for the foregoing reasons, the Trustee can avoid the transfers all of the Subject Properties and recover all of the Subject Properties from Rema.

Specifically, the Trustee can avoid the transfers of eight Subject Properties (Montana 1, Montana 2, Montana 3, Montana 5, Jim Bridger 1, Jim Bridger 2, Horizon City, and Southside) made directly from Abie to Rema, as "actual fraudulent transfers" under § 548(a)(1)(A) of the Bankruptcy Code, as well as § 24.005(a)(1) of TUFTA. Alternatively, the Trustee can avoid the transfers of these eight Subject Properties as "constructive fraudulent transfers" under § 548(a)(1)(B) of the Bankruptcy Code, as well as § 24.006(a) of TUFTA. The Trustee can recover these eight Subject Properties from Rema under § 550(a)(1) of the Bankruptcy Code.

Specifically, the Trustee can avoid the transfer of one of the Subject Properties (Montana 6) made from Abie to Phil and then Phil to Rema, as an "actual fraudulent transfer" under § 548(a)(1)(A) of the Bankruptcy Code, as well as § 24.005(a)(1) of TUFTA. The Trustee can recover the Montana 6 property from Rema under § 550(a)(2) of the Bankruptcy Code.

A separate Final Judgment will be signed by the Court and entered in the Fraudulent Transfer Adversary Proceeding (adv. no. 16-03002) as required by Rule 58 of the Federal Rules of Civil Procedure (which is incorporated into Bankruptcy Rule 7058), consistent with this Consolidated Opinion.

## V.
## CONCLUSIONS OF LAW
## DISCHARGE ADVERSARY PROCEEDING

The following constitutes the conclusions of law by the Court with legal analysis in the Discharge Adversary Proceeding (adv. no. 16-03005). The Discharge Adversary Proceeding is between the UST (as Plaintiff) and Abie, the debtor (as Defendant).

The UST objects to Abie's bankruptcy discharge under § 727 of the Bankruptcy Code.[44] Specifically, the UST seeks to deny Abie a bankruptcy discharge on three alternative legal grounds: (1) § 727(a)(2)(A) (for transferring or concealing property of the debtor within one year of bankruptcy filing with actual intent to defraud); (2) § 727(a)(2)(B) (for transferring or concealing property of the estate after the bankruptcy filing with actual intent to defraud); and/or (3) § 727(a)(4) (for making a false oath or account in connection with this bankruptcy case).

### A. Standard and Burden of Proof

The Bankruptcy Code embodies an "exchange" policy, particularly in a Chapter 7 bankruptcy case. If a debtor is truthful and completely discloses all required financial information, then the debtor in "exchange" gets a discharge of his debts—regardless of whether or not his creditors get paid. As other courts have more aptly described it:

> a discharge in bankruptcy is a privilege—not a right—which must be earned. Upon filing for bankruptcy, it is the debtor's obligation to be forthright in providing financial information. No one is obligated to recreate the debtor's financial affairs; that task is his alone. The Bankruptcy Code makes complete financial disclosure a "condition precedent" to discharge.... In short, the global purpose of § 727 is to relieve creditors from the burden of "discovering" assets and to place it where it rightfully belongs, upon the debtor.

---

[44] The UST has standing under § 727(c)(1) of the Bankruptcy Code to object to a debtor's discharge.

*First United Bank & Trust Co. v. Buescher (In re Buescher),* 491 B.R. 419, 431 (Bankr. E.D. Tex. 2013); *Sonders v. Mezvinsky (In re Mezvinsky),* 265 B.R. 681, 690 (Bankr. E.D. Penn. 2001) (citations and internal quotations omitted).

To deny a discharge to a debtor is a harsh remedy. *See, e.g.*, *Buescher,* 491 B.R. at 431; *Pher Partners v. Womble (In re Womble),* 289 B.R. 836, 845 (Bankr. N.D. Tex. 2003). As a result, the denial of discharge provisions under § 727(a) are strictly construed against parties attempting to deny a debtor his discharge. *See Laughlin v. Nouveau Body & Tan, LLC (In re Laughlin),* 602 F.3d 417, 421 (5th Cir. 2010) (supporting citations omitted); *Judgment Factors, LLC v. Packer (In re Packer),* 520 B.R. 520 (Bankr. E.D. Tex. 2014).

The party objecting to a debtor's discharge bears the burden of proof, by a preponderance of the evidence standard. *See* Bankruptcy Rule 4005; *Beaubouef v. Beaubouef (In re Beaubouef),* 966 F.2d 174, 178 (5th Cir.1992).

## B. <u>False Oath or Account—§ 727(a)(4)</u>

Here, the UST seeks to deny Abie his bankruptcy discharge under § 727(a)(4) of the Bankruptcy Code. In pertinent part, § 727(a)(4) provides

> (a)    The court shall grant the debtor a discharge, unless—
> (4) the debtor knowingly and fraudulently, in or in connection with the case—
> (A) made a false oath or account …

Under § 727(a)(4), a "false oath" sufficient to deny discharge includes a false statement by a debtor in bankruptcy schedules. Likewise, the omission of an asset by a debtor in bankruptcy schedules constitutes a "false oath". A false statement by a debtor during an examination in the course of the bankruptcy case can also be a "false oath".

*See The Cadle Co. v. Pratt (In re Pratt),* 411 F.3d 561, 566 (5th Cir. 2005); *Beaubouef,* 966 F.2d at 178.

As the Fifth Circuit has repeatedly recognized, full disclosure by a debtor in bankruptcy schedules in a Chapter 7 case is "essential". The bankruptcy schedules prepared by a debtor ensure that "adequate information is available to the trustee and creditors without the need for investigation to determine whether the information provided is true". *Pratt,* 411 F.3d at 566; *Sholdra v. Chilmark Fin. LLP (In re Sholdra),* 249 F.3d. 380, 382 (5th Cir. 2001); *Beaubouef,* 966 F.2d at 178 (supporting citations omitted).

To deny a debtor a discharge under § 727(a)(4)(A), it must be proven that: (1) the debtor  made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and  (5) the statement related materially to the bankruptcy case.[45] *See Pratt,* 411 F.3d at 566; *Beaubouef,* 966 F.2d at 178.

With respect to the fraudulent intent requirement, a debtor need not have acted deliberately to deceive creditors. "It makes no difference that [the debtor] does not intend to injure his creditors when he makes a false statement. Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them." *Beaubouef,* 966 F.2d at 178 (quoting *Chalik v. Moorefield (In re Chalick)*, 748 F.2d 616, 618 (11th Cir. 1984)). Circumstantial evidence may prove the requisite fraudulent intent. Further, the cumulative effect of false statements by a debtor may demonstrate "reckless disregard

---

[45] Although the burden of proof rests with the plaintiff (in this case, the UST) to prove by a preponderance of evidence that the debtor made a false oath, once the plaintiff has established a *prima facie* case of a false oath, the burden shifts to the defendant debtor to prove that he did not make a false oath. *See The Cadle Co. v. Duncan (In re Duncan),* 562 F.3d 688, 696 (5th Cir. 2009) (supporting citations omitted).

for the truth"—which is sufficient to support a finding of fraudulent intent to deny discharge. *See e.g., The Cadle Co. v. Duncan (In re Duncan),* 562 F.3d 688, 696 (5th Cir. 2009) (supporting citations omitted); *Sholdra,* 249 F.3d. at 382; *Beaubouef,* 966 F.2d at 178.

An "honest" mistake by the debtor in his bankruptcy schedules is not, by itself, sufficient to deny the debtor's discharge. *See Beaubouef,* 966 F.2d at 178. But a series of innocent mistakes or omissions by a debtor can show a pattern of reckless disregard for the truth, and courts look at the circumstances surrounding the omissions to determine if they were innocent or intentional. *See e.g., FDIC v. Sullivan (In re Sullivan)*, 204 B.R. 919, 942–43 (Bankr. N.D.Tex.1997) (supporting citations omitted).

A false statement or omission is "material" for the purposes of § 727(a)(4)(A) if it bears a relationship to the debtor's "business transactions or estate, or concerns the discovery of assets, business dealings, or the existence or disposition of the debtor's property." *Beaubouef,* 966 F.2d at 178 (quoting *Chalik*, 748 F.2d at 617); *Duncan,* 562 F.3d at 695. Materiality is not based solely on the value of an omitted item or whether the omitted item caused any detriment to creditors. *See Duncan,* 562 F.3d at 695; *Beaubouef,* 966 F.2d at 178.

A debtor's lack of competence or inexperience with financial matters does not excuse a debtor for making a false statement that justifies denial of a discharge. *See Sholdra*, 249 F.3d at 382-3. Knowingly false oaths in initial bankruptcy schedules filed by a debtor that are later amended by a debtor can still warrant denial of discharge— particularly when the amended schedules are filed after the debtor's initial falsehood is revealed in a debtor's examination. *See Sholdra*, 249 F.3d at 382.

The Court will now apply these legal principles to this Bankruptcy Case filed by Abie. In short, the record is replete with false oaths made by Abie.

Omission of Assets in Bankruptcy Schedules

To begin, there were several assets omitted by Abie from his sworn Bankruptcy Schedules filed in this Bankruptcy Case. (Ex. G-1). The Bankruptcy Schedules required Abie to list all assets (including real property and personal property) in which he had any interest on September 22, 2015—the date this Bankruptcy Case was filed.[46] In particular, Schedule A of his Bankruptcy Schedules required Abie to list all legal and equitable interests that Abie owned in real property on September 22, 2015. Abie answered, under penalty of perjury, "none". (Schedule A, Ex. G-1). This was a false oath by Abie.

The evidence at trial demonstrated that Abie still owns some interests in real estate—the Montana 4 property, the Luna County property, and the Hudspeth property. The evidence demonstrated that Abie acquired the Montana 4 property in June 2008. No probative evidence to the contrary was presented at trial. No probative evidence demonstrated that Abie had sold or transferred the Montana 4 property before bankruptcy. Instead, the evidence at trial showed that Abie still owns the Montana 4 property.

The evidence at trial also demonstrated that Abie acquired an interest in the Luna County property (about 31 acres) in March 2010. At trial, Abie testified that he had not paid for the Luna County property and thus he never took ownership. Even if Abie's

---

[46] Abie certainly knew the critical importance of listing _all_ of his assets in his Bankruptcy Schedules in this present Bankruptcy Case. This is because Abie's 2013 Bankruptcy Case was dismissed with prejudice for two years based on the contention that Abie failed to list all of his assets (including vehicles) in that prior bankruptcy case.

trial testimony was true, Abie is still the record owner of the Luna County property based on the evidence and stipulations presented at trial.[47]

The evidence also demonstrated that Abie acquired the Hudspeth property (60 acres) in 2008, by warranty deeds recorded in December 2008 and November 2012. At trial, Abie's son Elvis testified that Abie had transferred the Hudspeth property to Elvis, but the supposed deed from Abie was not admitted into evidence at trial due to its lack of authenticity. Further, the supposed deed from Abie to Elvis was not recorded, so Abie is still the record owner of the Hudspeth property.

Abie was required to disclose these three real properties in his Bankruptcy Schedules, even if Abie only owned record title to these properties. Abie omitted these three real properties from his Bankruptcy Schedules, which constitutes a "false oath".

In addition, Schedule B of the Bankruptcy Schedules required Abie to list all personal property that Abie owned, including trucks, trailers, vehicles, and machinery, on September 22, 2015—the date this Bankruptcy Case was filed. Abie answered, under penalty of perjury, "none" other than a 1982 Mercedes. (Schedule B, Ex. G-1).

The evidence at trial demonstrated that Abie was awarded ownership of several large vehicles in the Divorce Decree entered in September 2014 (herein "Vehicles"). *See* Divorce Decree, ¶¶ H-6 through H-16 (Ex. G-25). At trial, Abie testified that he had provided the list of Vehicles to go into the Divorce Decree, so Abie definitely aware of the Vehicles and that the Vehicles had been awarded to him. The Divorce Decree awarding the Vehicles to Abie was entered just one year before Abie filed this Bankruptcy Case. At trial, Abie testified that the Vehicles were really owned by third

---

[47] Abie stipulated that he was still the record owner of the Luna County property (also called the "New Mexico" property) and Abie stipulated that he did not list his interest in the property in his Bankruptcy Schedules. *See* Joint PTO, ¶¶ 28-30 (dkt# 12, adv. no. 16-03005).

party customers. Even if this testimony by Abie is true, Abie would have been required to disclose the Vehicles in Question 14 of his sworn Statement of Financial Affairs (herein "SOFA") as property held for another. Instead, Abie answered "none" to this Question in his SOFA. (SOFA, Ex. G-1). Either way, Abie's lack of disclosure of the Vehicles constitutes a false oath.

The Court easily concludes that the omission of Abie's interests in these three real properties from his Bankruptcy Schedules and Abie's failure to make any disclosure of the Vehicles, either in his Bankruptcy Schedules or in his SOFA, were knowingly false statements made by Abie under oath. The omitted assets were "material" as they relate to the existence of Abie's assets and his business dealings, regardless of their value. Whether the omission of these assets was made with the requisite "fraudulent intent" by Abie is a closer call. But the multiple and cumulative false statements made by Abie demonstrate, at a minimum, a "reckless disregard for the truth" by Abie. As a result, the Court concludes that Abie had the requisite fraudulent intent when he omitted and did not disclose these assets in his Bankruptcy Schedules.

<u>False Statements in Statement of Financial Affairs ("SOFA")</u>

Abie also filed sworn Statement of Financial Affairs (herein "SOFA") in this Bankruptcy Case. (Ex. G-1). Numerous false oaths by Abie in his SOFA were proven at trial, as set forth in detail in the Court's Findings of Fact above.

SOFA Question 15 required Abie to disclose all places that Abie had lived in the last three years, and if he had moved in that period of time. Abie answered, under penalty of perjury, "none". (SOFA, Ex. G-1). This was a false statement by Abie. At trial, Abie admitted that he had moved and lived other places within the prior three years.

Abie later filed an Amended SOFA to list three locations where he had lived in the prior three years. (Ex. G-2). Yet at trial, at a creditor's meeting, and in his deposition, Abie testified about prior addresses that were inconsistent with even his Amended SOFA. Notably, the Amended SOFA was filed by Abie after the UST had filed this Discharge Adversary Proceeding contending that the statements made by Abie in his initial SOFA that he had not lived anywhere else in the prior three years were false.

Compounding this deception by Abie regarding his residences, Abie further stated in his bankruptcy petition that his current street address was 14424 Jim Bridger, El Paso, Texas 79938. (Ex. G-1). Yet at trial and in deposition, Abie admitted that this Jim Bridger address is merely a post office box—not a street address—and is not his place of residence. After being "called out" on this falsity by the UST, Abie filed an amended bankruptcy petition stating that he really resided on Marvin Lane in El Paso, Texas at the time he filed this Bankruptcy Case. (Ex. G-3).

Abie's locations over the past three years are of heightened importance in this Bankruptcy Case. In the three years before Abie's bankruptcy filing, numerous critical transactions occurred. In that three-year period, Abie filed his 2013 Bankruptcy Case and stated that he owned multiple real properties worth over $500,000. In that three-year period, Abie transferred many real properties to his then-spouse Rema, who supposedly Abie was not living with at the time. In that three-year period, Abie went to trial in the Starr Suit and a large judgment was entered against Abie. And in that three-year period, Abie got divorced from Rema in a rush divorce. Other critical events in this three-year period are described in detail in the chronology of pre-bankruptcy events set forth in the Court's Statement of Facts above.

The most deceitful sin by Abie in his sworn SOFA was hiding Rema's real name. SOFA Question 16 required Abie to disclose the name of his former spouse. Abie answered, under penalty of perjury, that "Ayoun Marian" was the name of his former spouse. (SOFA, Ex. G-1).  But Rema was Abie's former spouse. Rema's name—for the past 12 years—was "Rema Charles Wolf". There was no evidence that Rema ever went by the name "Ayoun Marian". At one point—over a decade ago—Rema's legal name was "Rema Ayoun Abual". In May 2003, Rema legally changed her name to "Rema Charles Wolf". (Ex. G-26).

This false statement by Abie in his sworn SOFA was clearly an intentional effort by Abie to hide the fact that the name of his former spouse was "Rema Charles". [48]  The numerous real properties owned by Abie were deeded by Abie to "Rema Charles" as grantee. Those deeds by Abie to "Rema Charles" were recorded in 2014, the year before Abie filed this Bankruptcy Case.[49]  The Court concludes that Abie was intentionally concealing the true name of his former spouse to try and cover-up the transfers of these real properties to his former spouse.

About five months after Abie made this false statement about the name of his former spouse in his sworn SOFA, Abie filed an Amended SOFA. (Ex. G-20). In the Amended SOFA, Abie "fessed up" and disclosed that his former spouse was really named "Rema Charles". (Ex. G-2). Notably, this Amended SOFA by Abie with the real

---

[48] Recall that Abie also concealed Rema's existence in his prior 2013 Bankruptcy Case. Abie stated in his 2013 Bankruptcy Schedules that he was "single" and that he had no spouse. (Ex. G-8). Of course, Abie was still married to Rema in the year 2013 (they were not divorced until September 2014). This pattern of concealment by Abie continued in this Bankruptcy Case filed in the year 2015.

[49] SOFA Question 10 required Abie to disclose all transfers of property made within the two years prior to his bankruptcy filing in September 2015 that were out of the ordinary course of business. Abie again answered, under penalty of perjury, "none". (SOFA, Ex. G-1).  Abie did not disclose the transfers of the nine real properties (the Subject Properties) to Rema and his son Phil by deeds recorded in 2014.

name of his spouse was *after* the UST had filed the Discharge Adversary Proceeding against Abie based on false statements about Rema, *after* the Trustee had filed the Fraudulent Transfer Adversary Proceeding against Rema, and *after* Abie had been cornered by the Trustee at his creditors meeting regarding his former spouse.

In sum, the Court concludes that Abie knowingly made numerous false oaths in his sworn SOFA. These false statements by Abie were "material" as they related to Abie's prior transactions, dealings, and the disposition of Abie's assets. These false oaths were made with fraudulent intent by Abie. Abie intentionally attempted to conceal Rema's real name and existence, because he had transferred numerous real properties to Rema. Abie's pattern of false statements about his prior locations in the last three critical years show a reckless disregard for the truth by Abie, which also demonstrates Abie's fraudulent intent to deceive.

<u>False Testimony at Creditors Meeting</u>

Abie also provided false testimony at his creditors meeting in this Bankruptcy Case on December 8, 2015. Prior to this creditors meeting, the Trustee had learned about the 2013 Bankruptcy Case filed by Abie and the multiple real properties that Abie stated he owned in the prior case. In the sworn 2013 Bankruptcy Schedules filed by Abie in his 2013 Bankruptcy Case, Abie had stated that he owned nine pieces of real property worth over $500,000. (Ex. G-8).

But now in this Bankruptcy Case filed in 2015, Abie had filed sworn Bankruptcy Schedules stating that he owned no real property and that he had not transferred any real property within the last two years. (Ex. G-1). Prior to this creditors meeting, the Trustee had been provided with deeds recorded in 2014 showing that Abie had

transferred several real properties to a "Rema Charles". At this point, the Trustee did not know who "Rema Charles" was. So understandably, the Trustee wanted to ask Abie questions about "Rema Charles" at the creditors meeting on December 8, 2015.  At the time, the Trustee had no reason to think that Rema Charles was Abie's former spouse, because Abie had stated in his sworn SOFA filed in this Bankruptcy Case that his former spouse was named "Ayoun Marian". (SOFA, Ex. G-1).

So, Abie appeared at this creditors meeting with counsel on December 8, 2015. Abie was put under oath. The Trustee asked Abie several questions to try to find out who this "Rema Charles" named on the deeds from Abie was.

When asked by the Trustee whether Rema Charles was a man or a woman, Abie testified that Rema Charles was a "man". When asked where Rema Charles lived, Abie testified "I don't know where he lives", and that Abie had not talked to "him for a long time."  Abie testified multiple times in the creditors meeting using male pronouns to refer to Rema Charles. Abie testified that Rema Charles was a "relative". When asked what kind of relative Rema Charles was, Abie testified "just a relative". When asked for additional information, Abie testified that Rema Charles was "from the family from the wife's side." When asked by the Trustee if Rema Charles was his wife's brother, Abie testified "maybe."  Abie testified that he worked for Rema Charles doing "legal paperwork." Abie testified that he did not know if Rema Charles had any children. Then when the Trustee asked if Abie's ex-wife owned any of the real properties listed on his 2013 Bankruptcy Schedules, Abie testified "I don't know". When asked what his ex-wife's name was, Abie testified "Irmee". When asked where his ex-wife was, Abie

testified he did not know. *See* Transcript, pp. 17-39 (Ex. G-30); Joint PTO ¶¶ 33-41 (dkt# 12, adv. no. 16-03005).

The Court concludes that Abie knowingly provided false testimony at the creditors meeting. Abie testified that Rema Charles was a man. This is patently false. Rema Charles is a woman and Abie knew that because he was married to her for over 20 years. Abie testified that Rema Charles was just a relative, probably from the wife's side of the family. This, again, was obviously false. Abie knew that Rema Charles was his wife for decades and Abie knew he had just been divorced from Rema a year before. Abie testified that he did not know if Rema Charles had children. This is false. Rema had four children with Abie and Abie obviously knew that. Abie also falsely testified that he did not know where his ex-wife was and failed to accurately provide his ex-wife's real name. Abie testified that he did not know if his ex-wife owned any of the real properties listed by Abie in his 2013 Bankruptcy Schedules. This are all falsehoods, as Abie himself had conveyed the real properties to Rema (his ex-wife) by deed.

The Court also concludes that this false testimony was given by Abie with intent to deceive. Abie provided this false testimony for obvious reasons—Abie transferred his real properties to Rema Charles before this Bankruptcy Case and Abie was trying to hide the fact that Rema Charles was really his ex-spouse. These false statements by Abie were material in this Bankruptcy Case, as they related to the disposition of Abie's real property to Rema and his transactions with his former spouse, Rema.

### C. Collateral Estoppel

In his Answer, and at trial, Abie argued that the dismissal of several Property Tax Suits filed by Abie in various state courts in September 2014 has preclusive "collateral

estoppel" effect and conclusively establishes that Rema (not Abie) owned five of the properties transferred by Abie to Rema. This argument by Abie has multiple flaws and must be rejected by the Court.

The details regarding these Property Tax Suits are set forth above in the Findings of Fact by the Court. In short, in 2011 and 2012, Abie filed the Property Tax Suits in state court contesting the tax valuation of five real properties. Abie was the plaintiff and the El Paso Central Appraisal District ("CAD") was the defendant in such suits. The Property Tax Suits lingered for several years after their filing. Then, in May 2014, the CAD filed motions to dismiss all five of the suits—asserting that the properties had been transferred from Abie to Rema and that Abie was not the record owner. The CAD based these motions to dismiss on the warranty deeds from Abie to Rema, which had just been recorded in the public records in March 2014. So, in September 2014, the state courts entered orders dismissing the Property Tax Suits filed by Abie, finding that Abie was not the owner of these properties and had no standing to bring the suits.

For several reasons, the Court concludes that the dismissal of these Property Tax Suits by the state courts does not have preclusive effect in this Discharge Adversary Proceeding that Rema (and not Abie) really owned these five real properties.

First, the recording of the deeds from Abie to Rema in March 2014 is clearly what caused these Property Tax Suits to be dismissed by the state courts. It is easy to see what transpired and why from a review of the pleadings and orders in such suits, as detailed by the Court in the above Statement of Facts.

Second, Abie and CAD were the parties to the Property Tax Suits. The UST was not a party to these Property Tax Suits and is not in privity with Abie or any party to

such suits. Neither was Rema a party to these suits or in privity with any party to the suits. As a result, the doctrine of collateral estoppel simply does not apply. *See e.g., Erlewine*, 349 F. 3d at 210 (supporting citations omitted).

Third, the interests of Abie (the debtor) in the Property Tax Suits and the interests of the UST in this Discharge Adversary Proceeding are different and distinct. As a result, collateral estoppel and other preclusive doctrines do not apply. *See e.g., Erlewine*, 349 F.3d at 210 (supporting citations omitted).

Finally, even if the Court were to give collateral estoppel effect to the fact that Rema owned the real properties which were the subject of the Property Tax Suits, it would not make any difference to the outcome of the Discharge Adversary Proceeding. The Property Tax Suits dealt with only *five* of Abie's real properties and Abie owned *nine* real properties that were transferred to Rema. Abie has also made multiple false statements in this Bankruptcy Case (which are detailed above), which have nothing to do with just these five real properties that were the subject of the Property Tax Suits.

Abie may also be asserting collateral estoppel as a defense based on the Divorce Decree entered by the state court. However, any collateral estoppel defense based on the Divorce Decree may be considered waived by Abie as the defense was not preserved in the Joint PTO filed by the parties in the Discharge Adversary Proceeding. *See* Joint PTO (dkt# 12, adv. no. 16-03005). Even if the Court considered this defense on the merits, collateral estoppel does not apply in this context for the same reasons set forth by the Court above in its Conclusions of Law in the Fraudulent Transfer Adversary Proceeding (*see* subheading "Impact of Divorce Decree"). *See also Erlewine*, 349 F.3d at 210.

In sum, for a host of reasons, collateral estoppel is not a defense to the UST's objection to the discharge of Abie.

### D. Conclusion

In conclusion, and for the foregoing reasons, the objection to discharge of Abie by the UST will be granted under § 727(a)(4) of the Bankruptcy Code. Abie has made numerous false oaths throughout this Bankruptcy Case that were knowingly false and material to this Bankruptcy Case. Some of the false oaths were made by Abie with fraudulent intent, and others were made by Abie with such repeated reckless disregard for the truth that fraudulent intent has been shown under the circumstances.

Since the Court has determined Abie's discharge should be denied under § 727(a)(4) of the Bankruptcy Code, the Court need not decide the propriety of denying discharge under § 727(a)(2)(A) or § 727(a)(2)(B). *See Beaubouef,* 966 F.2d at 177.

A separate Final Judgment will be signed by the Court and entered in the Discharge Adversary Proceeding (adv. no. 16-03005) as required by Rule 58 of the Federal Rules of Civil Procedure (which is incorporated into Bankruptcy Rule 7058), consistent with this Consolidated Opinion.

## VI.
## CONCLUSION

And so—despite the admittedly unfortunate circumstances of this case—the Court must conclude that the intentionally fraudulent transfer of several real properties by Abie to his ex-wife Rema must be avoided. The Trustee may recover these real properties for the benefit of Abie's bankruptcy estate, and Abie must be denied his bankruptcy discharge.